Marvin Flicker and Carol-Ann Flicker, et al. [1] v. Commissioner. Flicker v. Commissioner
Docket Nos. 1010-67, 1980-67, 2314-67, 2669-68 - 2690-68.
United States Tax Court
T.C. Memo 1970-252; 1970 Tax Ct. Memo LEXIS 113; 29 T.C.M. (CCH) 1115; T.C.M. (RIA) 70252; August 31, 1970, Filed Murray F. Hardesty, 3410 Van Buren, Topeka, Kan., and William P. Trenkle, Jr., for the petitioners. Larry K. Hercules and Rex A. Guest, for the respondent. IRWIN
Memorandum Findings of Fact and Opinion IRWIN, Judge: Respondent determined deficiencies in petitioners' income tax for the following years: PETITIONERS WHO FILED JOINT RETURNS
Petitioner
Docket
Deficiency
1964
1965
1966
Marvin Flicker and Carol-Ann Flicker
1010-67
$346.20
$675.13
0
John B. Schoonmaker
1980-67
662.64
0
0
Segundo J. Corripio and Josefina Corripio
2314-67
351.25
0
0
Raul S. Huet and Yolanda Huet
2669-68
695.16
655.17
0
Emanuel C. Wolff and Elizabeth M. Wolff
2670-68
667.58
0
0
Alfredo L. Hernandez and Anita V. Hernandez
2671-68
433.27
551.67
0
Gilson S. Webb and Ann L. Webb
2672-68
0
592.05
0
Allan H. Rabin and Nancy M. Rabin
2673-68
323.00
287.98
$608.59
Jaime Lievano and Raquel E. Lievano
2674-68
651.103
0
0
James G. Hall
2675-68
359.61
899.60
0
Jorge de la Torre and Julia R. de la Torre
2676-68
720.00
0
0
Jose M. Calleja and Maria E. Calleja
2677-68
0
691.52
663.96
Emilio Dominguez and Carlota A. Dominguez
2678-68
730.90
0
0
Robert E. Chapman and Sharon J. Chapman
2679-68
0
0
606.03
Steve E. Shelton and Marlene D. Shelton
2680-68
339.75
604.30
0
Humberto Diaz and Elaine Diaz
2681-68
696.75
0
0
John A. Cabala
2682-68
639.00
0
0
Charles E. Marsh and Phyllis Marsh
2683-68
523.87
0
0
Oscar R. Mercado and Ivonne M. Mercado
2684-68
0
647.09
0
Robert E. Linden and Deloris M. Linden
2685-68
243.00
359.93
0
Orlando Moreno and Erika Moreno
2686-68
324.00
0
0
Jose Almeida and Estrella B. Almeida
2687-68
0
0
618.35
Douglas R. Bey and Judie A. Bey
2688-68
0
0
607.04
Frederick H. Moe and Rigmor Moe
2689-68
380.23
0
0
Thomas W. Chaffee and Emma C. Chaffee
2690-68
710.53
680.43
0
*114 Certain adjustments in respondent's notices of deficiency not having been contested by the parties involved, the only question left for decision is whether amounts paid to petitioners by either the Topeka Veterans Administration Hospital or the Topeka State Hospital were excludable from income as fellowship grants under section 117 of the Internal Revenue Code. [2]
Findings of Fact Petitioners, who were residents of the communities indicated below at the time the petitions herein were filed, filed Federal income tax returns with the district director of internal revenue, Wichita, Kan., for the following years: PETITIONERS WHO FILED JOINT RETURNS Petitioners [3]
Place of Residence
Year
1964
1965
1966
Marvin Flicker and Carol-Ann Flicker
Topeka, Kan.
X
X
Segundo J. Corripio and Josefina Corripio
Topeka, Kan.
X
Raul S. Huet and Yolanda Huet
Topka, Kan.
X
X
Emanuel C. Wolff and Elizabeth M. Wolff
Bethany, Conn.
X
Alfredo L. Hernandez and Anita V. Hernandez
Wichita, Kan.
X
X
Gilson S. Webb and Ann L. Webb
Gainesville, Fla.
X
Allan H. Rabin and Nancy M. Rabin
Topeka, Kan.
X
X
X
Jaime Lievano and Raquel E. Lievano
Portsmouth, Va.
X
Jorge de la Torre and Julia R. de la Torre
Topeka, Kan.
X
Jose M. Calleja and Maria E. Calleja
Larned, Kan.
X
X
Emilio Dominguez and Carlota A. Dominguez
Topeka, Kan.
X
Robert E. Chapman and Sharon J. Chapman
Topeka, Kan.
X
Steve E. Shelton and Marlene D. Shelton
Topeka, Kan.
X
X
Humberto Diaz and Elaine Diaz
Great Falls, Mont.
X
Charles E. Marsh and Phyllis Marsh
Topeka, Kan.
X
Oscar R. Mercado and Ivonne M. Mercado
Atchison, Kan.
X
Robert E. Linden and Deloris M. Linden
Topeka, Kan.
X
X
Orlando Moreno and Erika Moreno
Washington, D.C.
X
Jose Almeida and Estrella B. Almeida
Osawatomie, Kan.
X
Douglas R. Bey and Judie A. Bey
Topeka, Kan.
X
Frederick H. Moe and Rigmor Moe
Larned, Kan.
X
Thomas W. Chaffee and Emma C. Chaffee
Livonia, Mich
X
X
*115 1 PETITIONERS WHO FILED INDIVIDUAL RETURNS
Petitioner
Place of Residence
Year
1964
1965
1966
John B. Schoonmaker
Topeka, Kan.
X
James G. Hall
Topeka, Kan.
X
X
John A. Cabala
Chicago, Ill.
X
Petitioners were medical doctors during each of the years in question, and were enrolled in the Menninger School of Psychiatry (hereinafter Menninger School) as nondegree students during all or part of these years. The Menninger School is a branch of the Menninger Foundation (hereinafter Foundation) of Topeka, Kan., a nonprofit center for professional education, research and treatment in the field of psychiatry. The Foundation consists of five major departments: professional education, research, psychoanalytic training, social psychiatry and the Menninger Clinic. The professional education department (now the Menninger School) was established after World *116 War II in response to the then urgent need for trained psychiatrists. In establishing this department the Foundation departed from the traditional method of training psychiatrists, which had formerly been accomplished by preceptorships. Instead, the method adopted by the Foundation, and now generally used by most universities, contemplated a program of residency coupled with a program of graduate study with an established curriculum in the field of psychiatry. For the years in question, the American Board of Psychiatry and Neurology (hereinafter "the Board") required a residency term of three years, in addition to two years of post-residency experience, before it would allow a physician to appear before its examiners in an effort to qualify as a diplomat in psychiatry. Accordingly, the residency program undertaken by each of the petitioners herein was geared to meet the Board's requirements. Each student (hereinafter sometimes referred to as a "fellow") entering the Menninger School was, accordingly, assigned, as a resident, to one of the hospitals [4] in Topeka affiliated with the school. He would thereafter be associated with such hospital for either a three-year or five-year period *117 of residency. Congress, by Act of January 3, 1946 (38 U.S.C.A. 15), established the Department of Medicine and Surgery in the Veterans Administration, and at the same time authorized the establishment of residency programs in medicine. Under authority of this Act, on July 19, 1951, a contract was entered into between the Veterans Administration Hospital at Topeka, Kans. (hereinafter the "TVAH") and the Foundation, whereby the Foundation for a consideration agreed to provide TVAH residents with a course of study in psychiatry. Pertinent provisions of this agreement read as follows: 1118 AGREEMENT BETWEEN VETERANS ADMINISTRATION AND THE MENNINGER FOUNDATION, TOPEKA, KANSAS
WHEREAS, the Veterans Administration, in the execution of laws it is charged with administering, has determined the necessity of maintaining a course of instruction and training in psychiatry for Veterans *118 Administration residents at the Veterans Administration Hospital at Topeka, Kansas, which the Veterans Administration with present personnel and facilities is not able to furnish, and WHEREAS, The Menninger Foundation, a corporation, situated at Topeka, Kansas, is avaiable to render professional services necessary for the operation and maintenance of such course of instruction and training in psychiatry to the extent specified in paragraphs 1 and 2 hereof, agreement is hereby entered into between the Veterans Administration and the Menninger Foundation, hereinafter referred to as the Contractor, as follows: 1. The Contractor agrees, subject to approval by the Veterans Administration, to plan and to provide general supervision of a course of instruction and training to be given residents in psychiatry at Veterans Administration Hospital, Topeka, Kansas. This includes lecture courses, seminars, section conferences, training in neuropathology and neurophysiology and other appropriate instruction and training as required by the Veterans Administration for residents in psychiatry. The instruction and training planned and supervised by the Contractor must meet all the requirements to *119 qualify Veterans Administration residents for acceptance to examination given by the American Board of Psychiatry and Neurology in addition to the requirements hereinafter required by the Veterans Administration. Schedule No. 1, attached hereto, is provided as a guide for the Contractor in preparing material for conducting the training required herein. The Manager, Veterans Administration Hospital, Topeka, Kansas, is authorized to make such deviations to Schedule No. 1, attached, as required by the Veterans Administration and to meet current or future requirements of the American Board of Psychiatry and Neurology or the Veterans Administration. 2. In addition to the services to be rendered as described in paragraph 1, hereinabove, the Contractor agrees to provide all necessary supervision of the course of instruction and training for residents in psychiatry at Veterans Administration Hospital, Topeka, Kansas. This not only [includes] supervision of the program of instruction and training, but also includes supervision of such supplementary instruction and training as may be furnished by the Veterans Administration from its own staff or otherwise, when such supplementary instruction *120 or training is deemed necessary by the Veterans Administration. * * * 3. In consideration of the services as provided in paragraphs 1 and 2 above, the Veterans Administration agrees to pay the Contractor the sum of $50,000 per year for such services, providing a minimum of 40 Veterans Administration residents are on duty, * * *. Veterans in residency training at the Veterans Administration Hospital, Topeka, Kansas, and accepting benefits under the above cited statute shall be charged by the Contractor the same fee as charged for other Veteran Administration Residents. Such charges shall be for the purpose of this paragraph the sum of $833.00 per year. * * * Further, the sum for which the Contractor is entitled for reimbursement will be reduced by $833.00 per year for each position for residents in psychiatry not filled below the number of 40, exclusive of the veteran residents in training and receiving benefits under the above cited law. * * * 6. * * * The Manager, Verterans Administration Hospital, Topeka, Kansas is charged with the responsibility of insuring that the services performed by the Contractor, as specified in paragraphs 1 and 2 above, meet the requirements of the Veterans *121 Administration * * *. 7. The Contractor agrees to submit in writing to the Veterans Administration during the period of the contract, at intervals specified by the Veterans Administration, reports of the progress of the residents receiving instruction and training under the terms of this agreement, furnishing such information as the Veterans Administration may require. 8. Duly authorized representatives of the Veterans Administration shall be permitted to visit the Contractor and to examine the training facilities and the work of the residents receiving instruction and training under this agreement. A copy of the schedule of studies to be followed by each resident shall be made available to the Veterans Administration. * * * 11. * * * For the purposes of this paragraph it is understood that the tuition rate per resident per year is $833. The Veterans Administration charged the amount paid to the Foundation for 1119 furnishing the course of instruction in psychiatry to an account designated "education and training." The Menninger School also provided the same course of instruction in psychiatry to resident physicians at the Topeka State Hospital (hereinafter TSH). An *122 agreement substantially the same as the one outlined above was also entered into by the Foundation and TSH. TVAH is a general service veterans' hospital. Priority of admission is given to persons with disabilities arising from military service. Others are admitted when facilities are available. Though TVAH admitted patients on a general basis, the majority of the persons treated suffered from mental disturbances and ailments of a psychiatric nature. Of the 1,011 available beds, 783 were devoted to psychiatric service. TSH is a Kansas state mental institution, serving the needs of the citizens of Kansas in the Topeka area. TSH treats men, women and children. Admission is based upon geographical proximity to the hospital, with no requirement as to the nature of the disorder. During the years in question, both TVAH and TSH operated five-year residency programs, as well as the three-year programs referred to above. The training received and services performed by five-year residents during their first three years of residency was identical to that which was experienced by the three-year residents. The only differences between the three-year and five-year programs were that those residents *123 who participated in the latter program received higher stipends and were obligated to provide two years of additional service upon completion of their first three years of residency. [5] The following contract (for which there was no "three year" counterpart) between petitioner Charles E. Marsh and TVAH outlines the nature of the commitment required of all five-year residents associated with TVAH: CONTRACT TO RECEIVE CAREER RESIDENCY TRAINING IN A SPECIALTY AND PERFORM OBLIGATED SERVICE I, Dr. Charles E. Marsh, having been accepted for employment as a Resident in the Department of Medicine and Surgery of the Veterans Administration, and training in Psychiatry, to commence immediately at the VA Hospital, Topeka, Kansas, agree, in consideration of such employment, specialty training, and salary comparable to that regularly received by a full-time physician or dentist, Intermediate Grade, to the following terms and conditions: 1. a. While receiving residency training contemporaneously with performance of service in the Department of Medicine and 1120 Surgery of the Veterans Administration, it is agreed that my salary shall be the same as that regularly paid a full-time physician *124 or dentist of equal Grade (at the time of my appointment or subsequent promotion), and it is further agreed that while I am in training status under this contract I shall be accorded the rights, privileges, benefits, and emoluments of a full-time physician or dentist in the Department of Medicine and Surgery of the Veterans Administration, as are provided by the applicable appropriate regulations. b. While I am rendering obligated service under this contract it is agreed that I will be paid the regular salary of a full-time physician or dentist in the Department of Medicine and Surgery of the Veterans Administration in the Grade at which I am appointed or to which I may be promoted and that I will be entitled to all rights, privileges, benefits, and emoluments of such a full-time physician or dentist, as are provided by the applicable appropriate regulations. 2. It is agreed such residency training shall be for such period of time and embrace such subjects and types of training and shall be provided continuously, for such periods and with such intermissions as the Veterans Administration may determine. 3. I will accept any transfer directed by the Veterans Administration from *125 one station to another station for completion of training, same to be at Veterans Administration expense with respect to me and my family and my household goods insofar as the then applicable Veterans Administration regulations will permit. 4. The duration of training, as determined by the Veterans Administration, will be for three years. The training will be comparable to the training received by a regular resident at the following grade levels: Junior for the 1st year of residency training; Intermediate for the 2nd year of residency training or its creditable equivalent; Senior (1st year) for the 3rd year of residency training or its creditable equivalent. In consideration of the training furnished under this agreement I obligate myself to remain in the employment of the Veterans Administration as a full-time physician or dentist in the Department of Medicine and Surgery in the field of Psychiatry for the following period of time in addition to the period spent in training status as a resident. a. If I receive 6 to 17 completed months of residency training under this contract, I will render one month of obligated service for each completed month of training. b. If I receive *126 18 to 26 completed months of residency training under this contract, I will render 18 months of obligated service. c. If I receive 27 to 36 completed months of residency training under this contract, I will render 24 months of obligated service. d. If I receive 37 or more months of completed residency training under this contract, I will render 24 months of obligated service plus one month for every month of residency training in addition to 36 months. 5. a. The Veterans Administration shall be entitled to such obligated service as I shall become liable to, in whole or in part, at the time considered most appropriate, as mutually agreed by the Directors of the training station and the obligated service station, which normally would be upon completion of training. * * * b. I agree to render the obligated service to which I am liable under this contract at any station designated by the Chief Medical Director of the Veterans Administration. I agree to accept obligated service at a station other than that in which I receive training. 6. Nothing herein shall be construed so as to create an obligation on the Veterans Administration to pay me any specific salary or to retain my *127 services for any specific period; both of such matters being governed by the appropriate regulations from time to time effective and applicable to physicians or dentists employed full-time in the Department of Medicine and Surgery of the Veterans Administration. 7. a. Unless my employment or training status shall be earlier terminated by the Veterans Administration, I will be obligated to continue said employment in the Department of Medicine and Surgery of the V.A. in the specialty in which I have received training under this contract, at such station or stations as may be designated by the Chief Medical Director of the Veterans Administration, during the period of obligated service as above described. In the event I terminate my status as a career resident before the end of the sixth month of training, or in the event of my failure to perform obligated service due, it is now agreed that I shall pay to the Veterans Administration, as restitution and not as a penalty, an amount which constitutes 90 percent of the difference between the total salaries which I actually receive during my [three-year] training period and the total salaries which a regular resident at comparable grade *128 levels and maximum salaries would receive during the same period. * * * b. In case the services required by this contract are not completed and result in restitution due the Veterans Administration in accordance with paragraph 7. a. 1121 above, it is agreed that all amounts due which represent accrued leave and retirement deductions will be applied against the indebtedness, and any balance remaining will be due and payable in amounts which will completely liquidate the amount of restitution due in not more than 24 monthly installments from the date of breach of the contract. [6]
*129 The two years of obligatory service under the above agreement was sufficient to satisfy the two years of experience required by the Board as a prerequisite to qualification as a diplomat in psychiatry. A three-year resident could, at any time, apply for a five-year residency. If he were accepted, his past salary payments would be adjusted to reflect the higher payments received by five-year residents. *130 Residents at both TSH and TVAH were charged tuition by the Menninger School in the amount of $833 per year. TSH residents were personally responsible for these amounts. However, residents associated with TVAH were relieved of their tuition obligation by the hospital. Money used to pay tuition fees for residents was charged to TVAH's "education and training" fund. Since the program of study was of a three-year duration, fourth- and fifth-year residents did not attend classes and were not liable for tuition payments. Residents at both hospitals were paid by their respective institutions in accordance with a predetermined salary schedule which specified the amount of compensation to which each physician was entitled, be he a resident or staff member. At TVAH amounts paid to residents were charged to a "patient care" account - the same account to which salaries paid to staff physicians were charged. The "education and training" account at TVAH was, by contrast, primarily funded to meet the annual cost of the previously mentioned education contract with the Foundation. Of the overall amount allotted to TVAH, $8,200,387 was earmarked for "patient care" and $49,710 was earmarked for "education *131 and training." Residents at both hospitals acquired annual leave and sick leave. If a resident's unexcused time away from the hospital exceeded the number of annual leave days available to him, he would be denied pay for that period of his absence which exceeded the number of leave days available to him. During their first three years, five-year residents were not allowed to use leave days at a rate greater than that which was available to three-year residents. At TVAH, Federal withholding tax and state withholding tax were deducted by the hospital from the amounts paid to each resident. In addition, FICA tax was withheld from the amount paid each three-year resident and civil service retirement money was withheld from the amount paid each five-year resident. As stated earlier, the type of clinical experience that a resident must have to eventually qualify as a diplomat in psychiatry 1122 is formulated by the Board. For the years in question the Board required that each resident gain extensive inpatient training as well as experience in neurology (3 to 6 months) and child psychiatry (6 months). Additional time in either outpatient work, research, community psychiatry, or *132 industrial psychiatry was also required. Accordingly, each of the residency programs was designed to acquaint the young physicians with on-the-job training in the areas specified above. Those skills which could not be acquired at the specific hospital to which a resident had been assigned were (during his second or third year of residency) acquired at one of the other participating Federal or state hospitals, or at one of the specialized governmental institutions in the Topeka area. A resident's typical day at either TVAH or TSH began at 8:00 a.m. and ended at 5:00 or 6:00 p.m. However, residents were encouraged not to watch the clock. During the academic years beginning July 1, 1963, July 1, 1964, and July 1, 1965, they attended classes at the Menninger School during their normal working hours. The average number of required classroom hours per week for a period of fifty-two weeks was as follows: Year
7-1-63
7-1-64
7-1-65
ofResidency
to6-30-64
to6-30-65
to6-30-66
1st year
5.0 Hr/Wk
3.8 Hr/Wk
3.8 Hr/Wk
2nd year
7.1 Hr/Wk
5.1 Hr/Wk
6.6 Hr/Wk
3rd year
4.0 Hr/Wk
3.4 Hr/Wk
4.0 Hr/Wk
A first-year resident's typical work day began with the morning *133 report at which time information regarding the recent behavior of patients assigned to the resident was conveyed by the resident to members of a medical treatment team which was usually under the supervision of a second-year resident who was, in turn, responsible to a staff physician. Had a staff physician been assigned to the patient under discussion, he would have delivered the morning report. In the case of a resident, the report was the product of his personal examination of the patient. In this vein, though, the examination made by a neophyte resident would have, at first, been closely supervised by a staff member, as the resident acquired maturity, the staff member involved would increasingly vest the first-year resident with more and more responsibility in making decisions and diagnosing problems. In a similar vein, as the first-year resident acquired expertise, he was expected to assist and supervise members of the treatment team who were not doctors. After the morning report, the young resident and other members of the team discussed in more detail various problems unearthed during the morning report. Again, had a staff physician been assigned to a patient being discussed, *134 he would have had to join in such discussion in the same manner as a resident. Following the team discussion, the resident would normally make his rounds, visiting the 30 or more patients assigned to him by the hospital in the same manner as a staff physician. Here, too, supervision would be commensurate with the progress made and knowledge acquired by the fledgling resident. Following a brief lunch, the resident would attend a team intake meeting during which time new patients would be discussed. Had a staff physician been assigned to the new patient, he, like any resident, would have participated in the intake meeting. During the rest of the afternoon the resident would see more patients, examine tests previously given to patients, talk with social workers and psychologists, interview relatives of patients, process new admissions and catch up on his paper work which included writing doctor's progress notes, doctor's orders, admission notes, and final summaries. At some time during the afternoon, a resident might have met with his supervisor for about an hour. Such meetings customarily occurred twice a week. Though a staff physician may have been assigned as many as four residents, *135 his patient load was normally unaffected by this added responsibility. Many staff persons viewed their teaching responsibilities as a source of stimulation, and, accordingly, enjoyed the challenge of teaching, even though they could probably have functioned more efficiently if there had been no residency program. On Tuesday and Thursday mornings the routine described above was altered to accommodate time for classroom study at the Menninger School. 1123 First-year residents at TVAH (and, presumably, residents at TSH) were exposed to many different departments within the hospital. Such exposure not only satisfied the requirements of the Board, but also broadened the young physician's awareness of the various facets of psychiatric medicine. However, some departments were staffed by experienced physicians only. Sometimes this was because the personnel of such a department were poor teachers. In addition to the daily regimen outlined above, first-year residents were given primary responsibility for admitting new patients. Each resident could expect to personally admit 55 or 60 new patients during his first year of training. In processing an admission, the resident would conduct *136 psychological and neurological tests in addition to interviewing the new patients. The findings garnered from the interview would then be discussed with a staff physician if time were available for such an exchange, and if the case were not an emergency. The admitting resident would then fill out an admission note, describing fully the condition of the patient. With experience and time, the recommendations contained in the admission note would, if reasonable, be routinely approved by the resident's supervisor. In addition, the resident, over a period of time, would assume more and more of the responsibilities attending the admission of a new patient. These would include discussions with psychologists, conferences with social workers, and, on occasion, interviews with the patient's family. Had an experienced staff physician been required to undertake these duties, he might have needed the same amount of time as was used by a resident in completing the admission process. At both hospitals, approximately twice a month, each resident was assigned O.D. (Officer of the Day) duty whereby he assumed primary responsibility for administrative duties such as (a) taking care of emergencies, *137 (b) examining and admitting new patients, (c) checking certain parts of the hospital, (d) seeing that all physically ill patients in the hospital received medical care, (e) developing the medical and surgical unit, and (f) making rounds of inpatient sections. At TSH, O. D.'s were assigned 24-hour shifts each day. O. D.'s at TVAH were on duty from 4:30 p.m. to 8:00 a.m. during week days; however, it appears that O. D.'s working on weekends and holidays put in 24-hour shifts. The typical working day for a second-year resident customarily began with activities similar to those of a first-year resident; viz., morning reports, team meetings, intake sessions and other related matters. As mentioned earlier, the second-year man conducted many of these meetings and discussions, and was expected to assist his less experienced first-year counterparts. In addition, later in the day, the second-year resident would participate in intake meetings relating to persons in the outpatient clinic. If required, the intake session might be followed by a lengthy interview with the new patient during which time (usually 6 to 8 hours) the second-year resident would evaluate the patient's disorder. Time would *138 also be spent with his supervisor in the same fashion as a first-year resident. During the afternoon, the second-year resident might also have had appointments and might have visited with some of the five to seven inpatients assigned to him. Depending upon their assignment, second-year residents at TVAH (and, presumably, some residents at TSH) would spend some of their time in either neurological service or psychosomatic service, as opposed to the outpatient clinic. Seminars at the Menninger School were held for second-year men on Mondays between the hours of 4:15 p.m. and 6:00 p.m. Third-year residents were not required to report to the inpatient section of either hospital. Most of their time was spent in the neurology and psychosomatic departments (6 months) at TVAH, and at various other institutions such as the Kansas University student guidance clinic in Lawrence, the North Kansas Treatment Center for Children or the nearby Boys Industrial School. While working at any of these lastmentioned institutions, residents at both TVAH and TSH would continue to receive regular payments from their home hospital even though no services were being performed for their respective home institutions. *139 The experience gained by third-year residents at places like the Boys Industrial School (and required by the Board) could not have been gained at either home hospital because of the dearth of patients in their juvenile years. By virtue of annual promotions, the amounts paid to third-year residents by TVAH and TSH were more than that paid second-year residents which, in turn, was more than that paid first-year residents. The following table shows the amounts treated as nontaxable fellowship grants by petitioners during the years indicated: 1124 Petitioner
Docket No.
Taxable Year
AmountExcluded
Hospital
Marvin Flicker
1010-67
1964
$1,800
TVAH
1965
3,600
TVAH
John B. Schoonmaker
1980-67
1964
3,600
TVAH
Segundo Corripio
2314-67
1964
3,600
TSH
Raul S. Huet
2669-68
1964
3,600
TVAH
1965
3,600
TVAH
Emanuel C. Wolff
2670-68
1964
3,600
TVAH
Alfredo Hernandez
2671-68
1964
3,600
TSH
1965
3,600
TSH
Gilson S. Webb
2672-68
1965
3,600
TVAH
Allan H. Rabin
2673-68
1964
1,800
TVAH
1965
1,800
TVAH
1966
3,600
TVAH
Jaime Lievano
2674-68
1964
3,600
TSH
James G. Hall
2675-68
1964
1,500
TVAH
1965
3,600
TVAH
Jorge de la Torre
2676-68
1964
3,600
TSH
Jose M. Calleja
2677-68
1965
3,600
TSH
1966
3,600
TSH
Emilio Dominguez
2678-68
1964
3,600
TSH
Robert E. Chapman
2679-68
1966
3,600
TSH
Steve E. Shelton
2680-68
1964
1,800
TSH
1965
3,600
TSH
Humberto Diaz
2681-68
1964
3,600
TSH
John A. Cabala
2682-68
1964
3,600
TVAH
Charles E. Marsh
2683-68
1964
1,800
TVAH
Oscar R. Mercado
2684-68
1965
3,600
TVAH
Robert E. Linden
2685-68
1964
1,350
TSH
1965
2,250
TVAH
Orlando Moreno
2686-68
1964
1,800
TVAH
Jose Almeida
2687-68
1966
3,600
TSH
Douglas R. Bey
2688-68
1966
3,600
TSH
Frederick H. Moe
2689-68
1964
1,800
TSH
Thomas W. Chaffee
2690-68
1964
3,600
TSH
1965
3,600
TSH
*140 Opinion Section 117(a) provides, in pertinent part, that "In the case of an individual, gross income does not include * * * any amount received * * * as a fellowship grant." The regulations under this section further provide that the term "followship grant" does not include amounts representing "compensation for past, present, or future employment services" and/or amounts paid to an individual "to enable him to pursue studies or research primarily for the benefit of the grantor." Section 1.117-4(c), Income Tax Regs.
The sole issue in the case before us is whether the amounts paid to students of the Menninger School by the two hospitals where these students served as residents in psychiatry should be construed as fellowship grants within the meaning of section 117(a) and the above-mentioned regulations which were specifically upheld in Bingler v. Johnson, 394 U.S. 741 (1969). Under nearly identical circumstances the very question now before us has been previously decided in favor of respondent by this Court and by the Court of Appeals for the Tenth Circuit. See Ethel M. Bonn, 34 T.C. 64 (1960), and Woddail v. Commissioner, 321 F. 2d 721 *141 (C.A. 10, 1963), affirming a Memorandum Opinion of this Court. Both Bonn and Woddail dealt with the Menninger School and the question of whether Menninger students who were serving as residents at TVAH were entitled to exclude from income amounts paid to them by that institution. In each case the contract between the Menninger School and TVAH was in all pertinent respects identical to the July 19, 1951, agreement set forth in our findings of fact. Likewise, as was here the case, in each of the above cases residents at TVAH were employed in accordance with a predetermined salary schedule, received annual leave, were expected to put in a full work day, had income tax withheld from their pay checks, and were required to 1125 accept assignments designated exclusively by the hospital. Similarly, as in the fact pattern now before us, the residents in Bonn and Woddail performed valuable services for TVAH such as ministering to patients assigned to their care - as many as 25 at one time, meeting with psychologists and relatives and supervising and training other members of the medical team. These factors were sufficient in Bonn and Woddail to allow this Court and the Court of Appeals *142 to hold that the stipends paid to the petitioner residents therein were salary payments for services rendered. In the instant case, not only was evidence introduced relating to the above matters, but we have also been benefited by testimony relating to additional professional services performed by residents at TVAH and not mentioned in either of the earlier opinions. Particularly significant was testimony which described the many responsibilities assumed by a young resident during the admission of a new patient - a task performed as many as 60 times a year by each new doctor. Of equal relevance was testimony addressed to the type of problem a resident O.D. (Officer of the Day) might expect to encounter during his 24-hour vigil. Given these illuminating insights, we see no basis for departing from the decisional law of Bonn and Woddail. We acknowledge that had there not been a residency program at TVAH, existing staff physicians would probably have been able to function more efficiently. However, in recognition of the countless services performed by residents under their supervision, we believe it is quite clear that had there not been a residency program the array of services provided *143 by the hospital would have had to have been drastically curtailed. Indeed, as the evidence poignantly indicates, many of the residents' assigned activities would have required the attention of a staff physician had a resident not been available. Moreover, as a resident acquired sophistication in an area, the supervision he received from his staff advisor was correspondingly lessened. Additionally, without the forum for intellectual exchange supplied by such a program, it is likely that many of the staff persons associated with TVAH would have sought employment at a hospital which was a "teaching" institution. To be sure, there are many factors which suggest that a substantial percentage of each resident's time was spent in pursuit of educational objectives. Of equal clarity is the fact that the residency programs herein enabled each young physician to be exposed to a kind of on-the-firing-line experience not obtainable in the classroom. However, the law is clear that such personal aggrandizement is not, of itself, enough to satisfy the requirements of section 117. Where the primary purpose of the payments being made is to compensate the recipient for services rendered the payor, *144 such amounts cannot be regarded as fellowship grants notwithstanding that the work experience involved might have resulted in educational benefit to the recipient. Elmer L. Reese, Jr. 45 T.C. 407 (1966), affd. per curiam 373 F. 2d 742 (C.A. 4, 1967), Ussery v. United States, 296 F. 2d 582 (C.A. 5, 1961). In the case at bar, we are firmly persuaded that the amounts paid were, to use the words of the Supreme Court, given only as a "quo" in return for the "quid" of services rendered. Bingler v. Johnson, supra, at p. 757. As stated in Bonn, and equally applicable here: Whatever petitioner's purpose in accepting a residency at the Hospital, it is apparent that she and the other residents there, all graduate physicians, performed valuable and essential professional services of a substantial nature, both in terms of time spent on duty and of the importance of the services to the Hospital. * * * [The] Hospital was organized and operated for the care and treatment of patients, who were admitted solely on the basis of veteran status and actual need for hospitalization. The value or worthlessness of any given case to the training of *145 residents or advancement of science was a matter of total indifference insofar as admissions were concerned. The adoption of a resident trainee program and the appointment of persons such as petitioner to residencies were merely incidental to and for the purpose of facilitating the raison d'etre of the Hospital, namely, the care of its patients. * * * Whatever the value to petitioner of any training and experience received by her, and whatever her aims and purposes in accepting the position, she in fact performed valuable services and received the amount in question as compensation therefor. Respondent's determination must be sustained. Accordingly, since the amounts paid residents at TVAH were for services rendered, such amounts were not excludable from income under section 117. Moreover, because of the close similarity between the residency programs offered to Menninger 1126 students at both TSH and TVAH, we further conclude that the reasoning stated above applies with equal force to persons who were residents at TSH, as well as those associated with TVAH. Additionally, since the training received and services performed by five-year residents during their first three years *146 of residency at either hospital was identical to that experienced by the three-year residents, we see no need to apply a different rationale to those petitioners who were involved in the five-year program. [7] Indeed, the committment on the part of each five-year resident to remain with his hospital upon termination of the initial three-year period of residency, as well as the other terms of the contract entered into by each five-year resident with TVAH and TSH, in which amounts to be paid such residents were consistently referred to as employee's salary payments, amply support this point. Cf. Bingler v. Johnson, supra; and Jerry S. Turem, 54 T.C. - (July 16, 1970).
Decisions will be entered for the respondent. Footnotes
1. Cases of the following petitioners are consolidated herewith: John B. Schoonmaker, Docket No. 1980-67; Segundo J. Corripio and Josefina Corripio, Docket No. 2314-67; Raul S. Huet and Yolanda Huet, Docket No. 2669-68; Emanuel C. Wolff and Elizabeth M. Wolff, Docket No. 2670-68; Alfredo L. Hernandez and Anita V. Hernandez, Docket No. 2671-68; Gilson S. Webb and Ann L. Webb, Docket No. 2672-68; Allan H. Rabin and Nancy M. Rabin, Docket No. 2673-68; Jaime Lievano and Raquel E. Lievano, Docket No. 2674-68; James G. Hall, Docket No. 2675-68; Jorge de la Torre and Julia R. de la Torre, Docket No. 2676-68; Jose M. Calleja and Maria E. Calleja, Docket No. 2677-68; Emilio Dominguez and Carlota A. Dominguez, Docket No. 2678-68; Robert E. Chapman and Sharon J. Chapman, Docket No. 2679-68; Steve E. Shelton and Marlene D. Shelton, Docket No. 2680-68; Humberto Diaz and Elaine Diaz, Docket No. 2681-68; John A. Cabala, Docket No. 2682-68; Charles E. Marsh and Phyllis Marsh, Docket No. 2683-68; Oscar R. Mercado and Ivonne M. Mercado, Docket No. 2684-68; Robert E. Linden and Deloris M. Linden, Docket No. 2685-68; Orlando Moreno and Erika Moreno, Docket No. 2686-68; Jose Almeida Almeida and Estrella B. Almeida, Docket No. 2687-68; Douglas R. Bey and Judie A. Bey, Docket No. 2688-68; Frederick H. Moe and Rigmore Moe, Docket No. 2689-68; and Thomas W. Chaffee and Emma C. Chaffee, Docket No. 2690-68.↩
2. All statutory references are to the Internal Revenue Code of 1954, as amended.↩
3. The term "petitioners" will at all times hereinafter be restricted to those persons among the petitioners enumerated above who, during the years in issue, served in a resident capacity with one of the Topeka, Kan., hospitals affiliated with the Menninger School of Psychiatry.↩
4. The participating hospitals were the Topeka Veterans Administration Hospital, the Topeka State Hospital and the C.F. Menninger Memorial Hospital, Topeka, Kan. However, during the years in issue, none of the petitioners were residents of the C.F. Menninger Memorial Hospital.↩
5. The following table discloses the type of residency program participated in by each petitioner: ↩
Doctor
Dkt. No.
Hospital
Res. Program
Marvin Flicker
1010-67
TVAH
5-year
John B. Schoonmaker
1980-67
TVAH
3-year
Segundo Corripio
2314-67
TSH
3-year
Raul S. Huet
2669-68
TVAH
5-year
Emanuel C. Wolff
2670-68
TVAH
5-year
Alfredo L. Hernandez
2671-68
TSH
5-year
Gilson S. Webb
2672-68
TVAH
5-year
Allan H. Rabin
2673-68
TVAH
3-year
Jaime Lievano
2674-68
TSH
5-year
James G. Hall
2675-68
TVAH
3-yr., 3 mos.
5-yr., remainder of time.
Jorge de la Torre
2676-68
TSH
5-year
Jose M. Calleja
2677-68
TSH
5-year
Emilio Dominguez
2678-68
TSH
5-year
Robert E. Chapman
2679-68
TSH
5-year
Steve E. Shelton
2680-68
TSH
5-year
Humberto Diaz
2681-68
TSH
5-year
John A. Cabala
2682-68
TVAH
3-year
Charles E. Marsh
2683-68
TVAH
5-year
Oscar R. Mercado
2684-68
TSH
5-year
Robert E. Linden
2685-68
TVAH
3-year
Orlando Moreno
2686-68
TVAH
5-year
Jose Almeida
2687-68
TSH
5-year
Douglas R. Bey
2688-68
TSH
5-year
Frederick H. Moe
2689-68
TSH
5-year
Thomas W. Chaffee
2690-68
TSH
5-year
6. The contractual arrangement between TSH and its five-year residents embodied provisions similar to those found in the TVAH agreement. Pertinent provisions found in the TSH contract are as follows: WHEREAS, the Department is desirous of obtaining qualified doctors training in psychiatry to work in the state institutions and WHEREAS, the Topeka State Hospital, under the Department, is recognized as a training hospital and qualified to give instruction in psychiatry and has been doing so under what is known as a three-year plan; and WHEREAS, it is now deemed to be beneficial to both the State of Kansas and the Physician for the Department to conduct what is known as a five-year plan of training with the basic idea that the Physician will be given three years training in psychiatry at the Topeka State Hospital and the Physician will continue his training by serving the State of Kansas for two years at other state institutions under supervision of consultants from the Topeka State Hospital; and WHEREAS, The American Board of Psychiatry and Neurology, Inc., requires three years of training and two years of exerience for a psychiatrist to be eligible for examination by said Board, and Certification by this Board is beneficial to the Physician; and WHEREAS, the Department deems it more beneficial to the state if it can be assured that the physician will serve two years at other institutions and, therefore, said Department is willing to pay more in the way of salary for physicians who will stay under the five year plan than for physcians who enroll under the three year plan. * * * IT IS THEREFORE AGREED by and between the parties hereto that the Department will employ said Physician under the five year plan at the agreed salary as set out in Civil Service regulations regarding employment, and the Physician agrees that he will remain for training and experience for the term of five years. It is further agreed that the Department may terminate the employment of the Physician for reasons of good cause. The Physician agrees that if he terminates his services at his own request with the Department prior to the expiration of the five years, he will reimburse, if he quits during the period of training, the difference between what he would have made were he under the three year plan and the amount he has made under this five year plan. * * *↩
7. Amounts earned by such persons during their fourth and fifth year of service are not here in issue.↩