FREDERICK FISHER, PETITIONER *v.* COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT

Docket No. 647–69.    Filed August 30, 1971.

*Thomas P. Glassmoyer* and *Robert A. Hanamirian*, for the
petitioner.

*Harold Gordon* and *Brian J. Seery*, for the respondent.

1206

OPINION

RAUM, *Judge:* Section 117(a)[3] excludes from gross income any amount received "as a scholarship at an educational institution" or "as a ·fellowship grant." Section 117(b) (2) limits the amount of the

---

[3] SEC. 117.  SCHOLARSHIPS AND FELLOWSHIP GRANTS.
(a) GENERAL RULE.—In the case of an individual, gross income does not include—
(1) any amount received—
(A) as a scholarship at an educational institution (as defined in section 151(e)(4)), or
(B) as a fellowship grant,
including the value of contributed services and accommodations;

exclusion available to nondegree candidates "to an amount equal to $300 times the number of months for which the recipient received amounts under the scholarship or fellowship grant" during the taxable year. Although on his return petitioner claimed a $3,600 deduction attributable to the payments he received from the Center, he now claims that $3,600 should be excluded from his gross income under section 117.

Section 1.117–4(c) of the regulations provides that certain payments are not to be considered scholarships or fellowship grants for purposes of the section 117 exclusion:

Sec. 1.117–4  Items not considered as scholarships or fellowship grants.

The following payments or allowances shall not be considered to be amounts received as a scholarship or a fellowship grant for the purpose of section 117:

\*      \*      \*      \*      \*      \*      \*

(c) *Amounts paid as compensation for services or primarily for the benefit of the grantor.* (1) Except as provided in paragraph (a) of § 1.117–2, any amount paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research, if such amount represents either compensation for past, present, or future employment services or represents payment for services which are subject to the direction or supervision of the grantor.

(2) Any amount paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research primarily for the benefit of the grantor.

However, amounts paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research are considered to be amounts received as a scholarship or fellowship grant for the purpose of section 117 if the primary purpose of the studies or research is to further the education and training of the recipient in his individual capacity and the amount provided by the grantor for such purpose does not represent compensation or payment for the services described in subparagraph (1) of this paragraph. Neither the fact that the recipient is required to furnish reports of his progress to the grantor, nor the fact that the results of his studies or research may be of some incidental benefit to the grantor shall, of itself, be considered to destroy the essential character of such amount as a scholarship or fellowship grant.

The validity of the regulations was upheld by the Supreme Court in *Bingler* v. *Johnson*, 394 U.S. 741. They are "designed, at least in part, to distinguish relatively disinterested payments made primarily for the purpose of furthering the education of the recipient from payments made primarily to reward or induce the recipient's performance of services for the benefit of the payor." *Jerry S. Turem*, 54 T.C. 1494, 1505; cf. *Elmer L. Reese, Jr.*, 45 T.C. 407, 411, affirmed per curiam 373 F. 2d 742 (C.A. 4).

The applicability of section 117 to payments received by resident physicians has already received judicial consideration on a number of occasions. With a few exceptions, courts considering this issue have consistently held such payments to be "compensation for past, present, or future employment services" or "payment for services which are subject to the direction or supervision of the grantor" and consequently not excludable from the recipient's gross income. See, e.g., *Quast* v.

*United States*, 428 F. 2d 750 (C.A. 8), affirming 293 F. Supp. 56 (D. Minn.) ; *Woddail* v. *Commissioner*, 321 F. 2d 721 (C.A. 10), affirming a Memorandum Opinion of this Court; *Irwin S. Anderson*, 54 T.C. 1547; *Aloysius J. Proskey*, 51 T.C. 918; *Ethel M. Bonn*, 34 T.C. 64; *Wertzberger* v. *United States*, 315 F. Supp. 34 (W.D. Mo.), affirmed per curiam 441 F. 2d 1166 (C.A. 8) ; *Tobin* v. *United States*, 71–1 U.S.T.C. par 9198, 27 A.F.T.R. 2d 71–791 (S.D. Tex.) ; *Coggins* v. *United States*, 70–2 U.S.T.C par 9687, 26 A.F.T.R. 2d 70–5775 (N.D. Tex.) ; *Kwass* v. *United States*, 70–2 U.S.T.C. par 9615, 26 A.F.T.R. 2d 70–5554 (E.D. Mich.) ; *Taylor* v. *United States*, 68–2 U.S.T.C. par. 9488, 22 A.F.T.R. 2d 5246 (E.D. Ark.) ; *Lingl* v. *Charles*, 68–1 U.S.T.C. par. 9153, 21 A.F.T.R. 2d 410 (S.D. Ohio) ;[4] cf *Michaels* v. *United States*, 71–1 U.S.T.C. par. 9455, 27 A.F.T.R. 2d 71–1339 (E.D. Mich.). But see *Pappas* v. *United States*, 67–1 U.S.T.C. par. 9386, 19 A.F.T.R. 2d 1276 (E.D. Ark.) ; *Wrobleski* v. *Bingler*, 161 F. Supp. 901 (W.D. Pa.).

We think that like treatment should be accorded to the payments petitioner received from the Center.

As a resident in psychiatry, petitioner rendered services to the Center which were both extensive and valuable. Throughout 1967 he had general responsibilities for interviewing, examining, and evaluating patients to whom he was assigned. He instructed medical students assigned to the hospital. During the first half of 1967, he was on call at night every 10 to 14 days and, according to the Center's manual, on such occasions had "primary responsibility for the entire hospital." In addition the pamphlet issued to residents at the Center described still other duties which included scheduling and unscheduling electroshock therapy, completing death certificates for patients who have died, and notifying the referring physician and nearest of kin in certain instances. See *Aloysius J. Proskey*, 51 T.C. 918, 923–924.

Furthermore, in carrying out his duties, petitioner acted under the direct or indirect supervision of staff psychiatrists. Petitioner's work on individual patients was reviewed by members of the hospital staff. Moreover, residents were appointed on a yearly basis, and petitioner's overall work at the Center was thus at least potentially subject to review at such times. The hospital staff supervised petitioner's work in such manner that it was quite unlikely that his work would not have been of benefit to the Center. See *Aloysius J. Proskey*, 51 T.C. 918, 924; *Jerry S. Turem*, 54 T.C. 1494, 1505.

---

[4] See also *Emerson Emory*, T.C. Memo. 1971–191 ; *Edward A. Ballerini*, 29 T.C.M. 1595, P–H Memo. 70–1745 ; *Janis Dimants, Jr.*, 29 T.C.M. 1138, P–H Memo. 70–1244 ; *Marvin Flicker*, 29 T.C.M. 1115, P–H Memo. 70–1218 ; *Austin M. Katz*, 29 T.C.M. 511, P–H Memo. 70–566 ; *Oscar A. Arnaud*, 27 T.C.M. 1541, P–H Memo. 68–1680 ; cf. *Jonathan M. Kagan*, 28 T.C.M. 617, P–H Memo. 69–661.

The Center's payments to petitioner enabled the hospital to gain his services. When petitioner originally was interviewed for a residency at the Center, he was informed of the availability of the payments made to residents—particularly those stemming from the NIMH grant. Cf. *Wertzberger* v. *United States*, 315 F. Supp. at 36. We note also that the Center's pamphlet, "Residencies in Psychiatry," referred to the total annual payments made to residents as "Salaries and Employment Benefits" and drew no distinction between funds originating with NIMH and those which did not. The amount of the payments was established by the Center in order to be competitive with other hospitals in the Philadelphia area. Without the payments stemming from the NIMH grant, the Center would have been unable to attract any residents at all. Cf. *Harvey P. Utech*, 55 T.C. 434, 440. Indeed, subsequent to the year here in issue, it accepted some residents who were not covered by an NIMH grant and paid them the same aggregate amount paid to those residents who were covered by the grant. Cf. *Lingl* v. *Charles*, 68-1 U.S.T.C. at 86,181, 21 A.F.T.R. 2d at 413; *Frank Thomas Bachmura*, 32 T.C. 1117, 1126. The payments to petitioner were tied inextricably to his status as a resident at the Center. The Center selected him as a resident, and it appointed him as a trainee just 2 weeks after he began his residency. During the year in issue, and until 1970, all residents at the Center received funds stemming from the NIMH grant. Furthermore, the amount of the payments received by the Center's residents was not dependent upon need but only upon length of service as a resident at the Center. See *Aloysius J. Proskey*, 51 T.C. 918, 924; *Wertzberger* v. *United States*, 315 F. Supp. at 36; *Tobin* v. *United States*, 71-1 U.S.T.C. at 85,832, 27 A.F.T.R. 2d at 71-792; see also *Coggins* v. *United States*, 70-2 U.S.T.C. at 84,756, 26 A.F.T.R. 2d at 70-5780:

In view of the fact that in this case the resident received an increase in pay with each year's experience, how can it be said that this increase in pay for a more experienced employee is within the ordinary understanding of scholarship or fellowship? Clearly the increase in pay is to compensate the doctor for his additional experience and greater value to the hospital.

Moreover, the "Hospital Routine and Procedure" manual issued by the Center to its residents, set out highly specific duties, hours on duty, and procedures to ensure proper timing of holidays and vacations so that adequate hospital coverage could be maintained. Such provisions strongly suggest both the value of the residents to the Center and the employee-employer relationship between them. A major function of the Center was patient care, and, as a resident, petitioner made a valuable contribution to the performance of that function. Petitioner's contribution was by no means an "incidental benefit" to the grantor. His services were precisely what he was being paid for and were sub-

ject to the Center's continual supervision. See Income Tax Regs., sec. 1.117–4(c). We conclude that the full amount of the payments received by petitioner from the Center in 1967 is includable in his gross income.

Petitioner has emphasized that the $3,600 here in issue is attributable to the NIMH grant to the Center, that petitioner did not perform services for the benefit of NIMH or under its supervision, and that the purpose of the NIMH program was to enable a greater number of persons to pursue careers in mental health disciplines and to improve the quality of mental health in the United States. Petitioner urges that NIMH is the "grantor" of the funds in issue and that it made disinterested payments primarily for the purpose of furthering petitioner's education. We disagree. We think that, under the circumstances herein, the Center, and not NIMH, must be considered the grantor of the payments. NIMH's own publication provided that "Trainee stipend grants *are not awarded directly* to individuals by the National Institute of Mental Health;" that such grants were made only to training institutions; that in order to benefit from the grants individual physicians were required to apply to the funded institutions; and that the institutions would select and pay the individuals they had chosen. Apart from establishing minimum educational and citizenship requirements, NIMH left selection of the recipient entirely to the Center. The Center's "program director," not NIMH, was responsible for the residents' duties at the Center. In light of all the additional evidence revealing the compensatory nature of the payments, we consider the foregoing circumstances to be highly significant. Although NIMH's grant to the Center may well have been disinterested and noncompensatory in nature, the Center's grant to petitioner was quite different. The payments were made in return for petitioner's income.[5] Cf. *Bingler* v. *Johnson*, 394 U.S. 741, 743, fn. 4; *Jerry S. Turem*, 54 T.C. 1494, 1505–1506; *Marjorie E. Haley*, 54 T.C. 642, 647;[6] Rev. Rul. 71–346, 1971–2 C.B.      .

To be sure, petitioner's training at the Center may make a substantial contribution to the health and welfare of the general public. But

[5] The statement of NIMH that the stipends "are not considered to be salary for services" was apparently made for purposes of determining the eligibility of trainees for fringe benefits and not for Federal income tax purposes. In any case, such a statement is certainly not determinative herein.

[6] In *Haley*, the Court stated (p. 647):

"The petitioner also attempts to support an exclusion for 75 percent of her educational grant under the theory that the grantor was the United States, not the State of Oregon. Her argument is that, as she had no employment relationship with the Federal Government, the grant, to the extent funded by Federal moneys under a 75 percent matching program, could not be in consideration of her 'past, present, or future services' to the Federal Government. Petitioner's argument must fail as her agreement was not with the Federal Government and as she did not receive funds from the Department of Health, Education, and Welfare or any other Federal Agency. The Federal government was not the grantor. Cf. *Norman R. Williamsen, Jr.*, 32 T.C. 154 (1950). (The grantor of the funds was the State Commission, and the funds were distributed from the general funds of the State of Oregon." See also *Emerson Emory*, T.C. Memo. 1971–191.

the existence of such a contribution is hardly inconsistent with our finding that the payments were made "primarily for the benefit of the grantor." See *Jerry S. Turem*, 54 T.C. 1494, 1506–1507. Similarly, it is not particularly significant that petitioner derived substantial educational benefits from his residency at the Center. See *Aloysius J. Proskey*, 51 T.C. at 925:

There can be no serious doubt that work as a resident physician provides highly valuable training, particularly in preparing for specialties in the various fields of medicine. Yet virtually all work as an apprentice, whether in medicine or law, carpentry or masonry, provides valuable training. Nothing in section 117 requires that an amount paid as compensation for services rendered be treated as a non-taxable fellowship grant, merely because the recipient is learning a trade, business, or profession. Whatever training petitioner received during the years of his residency—and we do not deny that it was substantial—was merely "incidental to and for the purpose of facilitating the *raison d'etre* of the Hospital, namely, the care of its patients." *Ethel M. Bonn*, 34 T.C. 64, 73 (1960) ; *Woddail v. Commissioner, supra.* * * *

At the trial herein, the medical director of the Center testified that the Center "probably could operate [without residents] without increasing its staff" by having its staff members care for patients during periods previously spent teaching residents. We do not find that testimony convincing. The services performed by residents at the Center were extensive. Even if the hospital could "operate" without residents, we think it quite doubtful that the Center could continue to care for as many patients and as effectively as it could with their help. Cf. *Ethel M. Bonn*, 34 T.C. 64, 71.[7] More fundamentally, even if the Center *could* do without residents, it did not do without them; it used their services, and it paid for them. Many employees may be dispensable in the sense that their employers could "operate" without them. But such dispensability hardly renders their salaries noncompensatory.

Petitioner relies upon *Wrobleski* v. *Bingler*, 161 F. Supp. 901 (W.D. Pa.), and *Pappas* v. *United States*, 67–1 U.S.T.C. par. 9386, 19 A.F.T.R. 2d 1276 (E.D. Ark.). Both cases are distinguishable from the facts presented herein. In *Wrobleski*, the District Court found that the Western State Psychiatric Institute & Clinic, was primarily an institution for teaching and research. That is not the case here. In *Pappas* a jury found that payments made by the University of Arkansas Medical Center were made primarily for the purpose of furthering the taxpayer's education and training. We have made no such finding here.[8]

*Decision will be entered for the respondent.*

---

[7] It is far from clear to us that the Center would continue to be as attractive to staff physicians if it ceased to be a teaching hospital. Cf. *Marvin Flicker*, 29 T.C.M. 1115, 1125, P–H Memo. 70–1218, 70–1230.

[8] Cf. *Janis Dimants, Jr.*, 29 T.C.M. 1138, 1143, P–H Memo. 70–1244, 70–1249.