HOWARD LITTMAN AND ARLINE C. LITTMAN, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 93341.   Filed June 15, 1964.

*Moe D. Karash*, for the petitioners.

*O'Hear W. Fraser, Jr.*, for the respondent.

ARUNDELL, *Judge:* Respondent determined a deficiency in income tax for the calendar year 1958 in the amount of $844.14.

The only issue is whether any portion of the payments received during 1958 by petitioner Howard Littman while at Argonne Notional Laboratory is excludable from petitioners' gross income as a "fellowship grant" under section 117(a)(1)(B), I.R.C. 1954.

### FINDINGS OF FACT

Some of the facts were stipulated and are so found.

Petitioners are husband and wife, residing at Syracuse, N.Y. They filed a joint return for the calendar year 1958 with the district director of internal revenue at Syracuse. Hereafter, we will sometimes refer to the husband as petitioner.

During the year 1958 Argonne National Laboratory of Lemont, Ill., hereafter sometimes referred to as Argonne, was operated by the University of Chicago under a contract with the U.S. Atomic Energy Commission, hereafter sometimes referred to as AEC. Argonne was a research and development laboratory operated as a separate administrative unit of the University of Chicago, which was an organization described in section 501(c)(3) of the Internal Revenue Code of 1954, and which is exempt from tax under section 501(a) of the 1954 Code.

Petitioner was associated with Argonne in the capacity hereafter indicated for the period from September 20, 1957, to January 23, 1959.

Prior and subsequent to this period, petitioner was employed as an assistant professor in chemical engineering at Syracuse University.

Petitioner received a bachelor of science degree from Cornell University in 1951 and a doctor of philosophy degree from Yale University in 1956. At both places he majored in chemical engineering.

The contract between the University of Chicago and AEC contemplates that certain programs will be carried out at Argonne for AEC, there being in general four such programs: (1) A reactor development program, (2) a physical research program, (3) a biological research program, and (4) a training and education program. The contract, which amends an earlier amended contract, reads in part as follows:

It is the purpose of this agreement to provide the arrangements under which the present atomic energy research and development program under this amended contract may be continued so as to encourage basic scientific progress and to assure optimum technical accomplishment in the interest of the national defense and public welfare. It is the intent of the Commission and the University that this agreement shall be carried on in a spirit of friendly cooperation with a maximum effort in achieving common objectives. It is expressly understood that this agreement is subject to the paramount objective of assuring the common defense and security of the United States.

Specific work done at Argonne results from proposals made to the AEC on an annual submission basis, which proposals in turn are submitted to the Bureau of the Budget and to the Congress for authorization and appropriation. Proposals are made by division directors at Argonne to the director of Argonne and are subject to approval by the AEC.

All funds expended at Argonne are funds of the AEC which are appropriated by the Congress. These funds are advanced to the University of Chicago by the AEC and the University of Chicago must account for the cost of operating Argonne against funds advanced. There is no authorization to grant fellowships with these funds or to grant these funds to students.

The training and education program at Argonne is the function of a division at Argonne called the International Institute of Nuclear Science and Engineering. This division was established primarily for individuals who are paid no salary but who pay tuition and are enrolled in courses therein as students, and yet all of Argonne's employees are eligible to audit these courses upon obtaining permission.

S. Lawroski is director of the Chemical Engineering Division at Argonne. The petitioner wrote to Lawroski on March 7, 1957, and expressed an interest in "spending a year at Argonne." The petitioner stated that he was particularly interested in attending school at Argonne and in gaining some research experience in the nuclear field.

Petitioner thereafter, on March 20, 1957, submitted an "Application for Employment" to Argonne. He also spoke to A. A. Jonke of Argonne at an American Chemical Society meeting at Miami, Fla., sometime in 1957.

At the American Chemical Society meeting in Miami, Fla., Jonke discussed with petitioner the programs being carried out by the Chemical Engineering Division at Argonne, and petitioner was informed of a fluidization project at Argonne. The fluidization project was commenced at Argonne in 1953. On May 1, 1957, petitioner wrote to V. H. Munnecke at Argonne as follows:

I was very glad to have the opportunity to speak with Mr. Jonke in Miami and to learn something about your program. Many of the problems he told me about were interesting, but in the light of my lack of background in your field, I felt it best not to express any preference for any particular problem until I had a chance to acquaint myself with the field this summer and the details of the problems.

By letter dated May 17, 1957, to petitioner from the professional personnel officer of Argonne, petitioner was advised in part as follows:

We are pleased to offer you a temporary appointment for approximately one year as a Resident Research Associate with the Chemical Engineering Division at a salary of $915 per month. We trust that satisfactory arrangements can be made to permit your leave of absence from Syracuse University.

This offer is subject to certain Laboratory policies which are described on the attached sheets.

We will look forward to hearing from you and certainly hope that your reply will be favorable. If so, we would appreciate knowing the date on which you would like to begin your appointment.

The above offer was subject to a physical examination and was also contingent upon petitioner's receiving a security clearance. Petitioner was told that "Continued employment with the Laboratory will be dependent upon participation in physical examinations and laboratory tests," and that he was required to enroll in the group life insurance program at Argonne. Petitioner was advised that it was customary to reimburse "employees" for transportation and moving expenses but that such reimbursements would be considered as wages and subject to withholding.

A resident research associate is a staff employee at Argonne but the name designates a temporary staff employee as opposed to a permanent or "regular" employee. Resident research associates are recruited from university campuses with the hope that they will bring new ideas to Argonne and that they will take knowledge they obtain at Argonne back to their universities. Such appointments not only aid the University of Chicago in meeting its research and develop-

ment objectives but they also assist the universities by insuring that their instruction is up to date in various areas within the atomic energy field.

Approximately 10 percent of the staff employees at Argonne are resident research associates. Although the total number of staff employees at Argonne is fixed, there is no limitation as to what percentage of the total number of staff employees may be resident research associates. Resident research associates replace regular employees and a decrease in the number of resident research associates would require a corresponding increase in the number of regular employees.

Resident research associates perform the same duties as permanent staff employees. Resident research associates and permanent staff employees are both expected to spend 40 hours a week at work, and resident research associates are subject to Argonne's office hours to the same extent as regular staff employees. Both resident research associates and permanent staff employees are paid a salary and have group life insurance, group hospitalization insurance, paid vacations, paid holidays, and paid sick leave. Resident research associates have all of the benefits that permanent employees have except that resident research associates, as temporary employees, are not covered by a retirement plan. Resident research associates and permanent staff employees are both expected to carry out research, to write progress reports for their supervisors, and to write a final report on completion of their projects. The final report is the end product of the work done by all staff employees.

Upon arriving at Argonne, petitioner was told of research that those at Argonne were interested in having done. It was required that petitioner work on a subject within the area of research being carried on by the Chemical Engineering Division, and petitioner in fact worked on a project suggested to him by staff members at Argonne. Petitioner did research on a project concerned with fluidization, which was part of the reactor development program at Argonne. Petitioner's salary was charged to the reactor development program at Argonne.

Petitioner executed a "Resident Associate Agreement" at Argonne on September 23, 1957. Petitioner agreed therein to accept "certain compensation for my services" and agreed that he would make "no other claim for any work performed for the benefit of the Laboratory." Petitioner further agreed that every invention or improvement conceived or made by him while at Argonne should become the property of the United States, and he waived all rights to compensation or to a pecuniary award for such inventions or improvements.

At Argonne petitioner was accorded group term life insurance, accident and health insurance, and other employee benefits. Petitioner submitted progress reports with reference to his research and also submitted a report wherein he recommended future studies of heat and mass transfer and fluidized beds. On October 3, 1958, petitioner submitted a preliminary report in which he indicated some of the results of his research at Argonne. Petitioner did not submit a final report.

While at Argonne petitioner was allowed to audit courses at the International Institute of Nuclear Science and Engineering. Petitioner was not a candidate for a degree but obtained permission to spend approximately 10 percent of his time auditing these courses. These courses were open to all of the staff employees at Argonne.

Argonne does not refer to the salary it pays a resident research associate as a "fellowship grant." Withholding and Federal Insurance Contributions Act (FICA) taxes were withheld from the salary paid petitioner, and the employer's share of FICA taxes was paid with respect to this salary.

On their joint return for 1958 petitioners, in accordance with section 117(b)(2)(B) of the 1954 Code, excluded from gross income $3,600 of the $10,980 received by petitioner from Argonne during 1958 and explained the exclusion on the return as follows:

My work at the Argonne National Laboratory was on a research fellowship grant. I was not a candidate for a degree. The laboratory is a non-profit organization, therefore, I excluded $300 for each of the 12 months I was at Argonne in 1958.

The respondent disallowed the claimed exclusion of $3,600 and explained his disallowance thus:

(a) It is determined that the $10,980.00 salary paid to Howard Littman in 1958 by Argonne National Laboratory is fully includible in income, and no part thereof is excludable as a fellowship grant.

#### ULTIMATE FINDINGS OF FACT

Petitioner's employment at Argonne was primarily for the purpose of assisting the University of Chicago to meet its research commitment to the AEC and not to enable petitioner to further his education and training.

Petitioner in fact performed research services for the University of Chicago, and his services were subject to the control and supervision of the University of Chicago.

Petitioner was paid for the research he did at Argonne and did not receive a fellowship grant.

The payments received by petitioner represented compensation for employment services.

OPINION

The material provisions of section 117 are in the margin.[1] "Section 117 is a new section which has no counterpart in the 1939 Code." *Norman R. Williamsen, Jr.,* 32 T.C. 154, 159. We have not set out in the margin any part of section 117(b) for the reason that in his brief the respondent "concedes that in this case the limitations of Section 117(b)(2) are not applicable." Petitioner makes no contention that he was a candidate for a degree and makes no contention for an exclusion from gross income of an amount in excess of the limitation of $3,600 specified in section 117(b)(2)(B). The only question is whether $3,600 of the $10,980 received by petitioner was received as a "fellowship grant" as that term is used in section 117(a)(1)(B).

The term "fellowship grant" is fully and amply defined and explained in the Income Tax Regulations, the material provisions of which are in the margin.[2] These regulations have been held to conform to the statutory purpose. See *Ussery* v. *United States,* 296 F. 2d 582 (C.A. 5, 1961); *Woddail* v. *Commissioner,* 321 F. 2d 721 (C.A.

---

[1] SEC. 117. SCHOLARSHIPS AND FELLOWSHIP GRANTS.

(a) GENERAL RULE.—In the case of an individual, gross income does not include—

(1) any amount received—

\* \* \* \* \* \* \*

(B) as a fellowship grant, \* \* \*

[2] Sec. 1.117-3 Definitions.

(c) *Fellowship grant.* A fellowship grant generally means an amount paid or allowed to, or for the benefit of, an individual to aid him in the pursuit of study or research. The term includes the value of contributed services and accommodations (see paragraph (d) of this section) and the amount of tuition, matriculation, and other fees which are furnished or remitted to an individual to aid him in the pursuit of study or research. The term also includes any amount received in the nature of a family allowance as a part of a fellowship grant. \* \* \*

(d) *Contributed services and accommodations.* The term "contributed services and accommodations" means such services and accommodations as room, board, laundry service, and similar services or accommodations which are received by an individual as a part of a scholarship or fellowship grant.

Sec. 1.117-4 Items not considered as scholarships or fellowship grants.

The following payments or allowances shall not be considered to be amounts received as a scholarship or a fellowship grant for the purpose of section 117:

\* \* \* \* \* \* \*

(c) *Amounts paid as compensation for services or primarily for the benefit of the grantor.* (1) Except as provided in paragraph (a) of § 1.117-2, any amount paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research, if such amount represents either compensation for past, present, or future employment services or represents payment for services which are subject to the direction or supervision of the grantor.

(2) Any amount paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research primarily for the benefit of the grantor.

However, amounts paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research are considered to be amounts received as a scholarship or fellowship grant for the purpose of section 117 if the primary purpose of the studies or research is to further the education and training of the recipient in his individual capacity and the amount provided by the grantor for such purpose does not represent compensation or payment for the services described in subparagraph (1) of this paragraph. Neither the fact that the recipient is required to furnish reports of his progress to the grantor, nor the fact that the results of his studies or research may be of some incidental benefit to the grantor shall, of itself, be considered to destroy the essential character of such amount as a scholarship or fellowship grant.

10, 1963), affirming a Memorandum Opinion of this Court; and *Frank Thomas Bachmura*, 32 T.C. 1117, 1126–1127.

Under these regulations the test is whether amounts paid or allowed to an individual are amounts paid or allowed *primarily* to aid the individual in the pursuit of study or research or whether such amounts represent compensation for services *primarily* for the benefit of the grantor. There is no doubt in our minds that petitioner hoped to gain further knowledge at Argonne which he could use to his advantage in resuming his teaching at Syracuse. But we do not think this was the primary purpose of the payments. We think the primary purpose of the payments was compensation for services rendered at Argonne primarily for the benefit of the grantor and as such are items *not* considered as fellowship grants under section 1.117–4(c)(1) and (2) of the Income Tax Regulations.

The respondent offered the testimony of the business manager and administrative assistant at Argonne, George H. Dickerson, and also the testimony of the senior engineer and assistant section head in the Chemical Engineering Division at Argonne, Jonke. Dickerson testified that Argonne had approximately 5,000 employees, 10 percent of whom were temporary staff employees known as resident research associates and that petitioner was definitely one of the latter. In answer to the question whether the primary purpose for which resident research associates are brought to Argonne is to increase the flow of knowledge between the universities and Argonne or whether it is fundamentally a matter of Argonne wanting to further its research commitment with AEC, and in answer to questions from the Court, Dickerson said:

A. I would say both purposes are involved in this program. First of all, the only way that Argonne has the money to pay any of these employees, is by using it to do the research work that is assigned; so that the only basis on which we can hire and pay the people——

The COURT: You have no authority then, to grant a fellowship?

The WITNESS: We have no authority to grant or give away any sums of money of the United States Government. We have to justify every penny we spend. In dealing with the Government, you have to.

The COURT: There is no authorization in your agreement whereby you could grant the money to a student?

The WITNESS: No sir, it could be possible. For instance, Brookhaven National Laboratory does have the authority to grant some fellowships, but Argonne not at present, or in its existence to date; so our primary purpose has to be to justify the expenditure of money to accomplish the purpose for which the money is provided.

Dickerson further testified that payments to resident research associates were definitely never referred to as fellowship grants but always as salaries. Asked if in this case petitioner was advised by Argonne

that Argonne did *not* consider the payments to petitioner to be a fellowship grant, Dickerson answered:

A. Yes, at the time of his employment. He sought employment with the Laboratory on a temporary basis. He filled out an application for employment. This was reviewed and accepted, and then all the regular employment forms were put into effect.

I personally approved of the employment form that put him on the payroll, and that specified what his status was. A copy of the form was made available to him and it specified that he was employed in the chemical engineering division with Mr. Jonke.

I filled out the form and he went through the regular employment process.

Jonke was petitioner's supervisor. He testified that petitioner was expected to carry out a research study and to report on his progress to his supervisor, and to write a final report on the work at the completion of the program, and that he could see no difference between petitioner's work and the work of the regular employees.

We hold that petitioner was essentially an employee of Argonne during 1958 and that the payments received by him represented compensation for services rendered and that no part thereof can be considered as a "fellowship grant" as that term is used in section 117(a)(1)(B) of the 1954 Code. The fact that petitioner was allowed to audit courses at the International Institute of Nuclear Science and Engineering and the possibility that petitioner received certain knowledge that proved helpful to him when he returned to his teaching at Syracuse are, in our opinion, merely incidental to petitioner's employment as a resident research associate. We sustain the respondent's determination. *Frank Thomas Bachmura, supra; Ethel M. Bonn*, 34 T.C. 64; *Ussery* v. *United States, supra; Woddail* v. *Commissioner, supra.*

*Decision will be entered for the respondent.*