Janis Dimants, Jr., and Bozena Dimants v. Commissioner.
Dimants v. Commissioner
Docket No. 691-70 SC.
United States Tax Court
T.C. Memo 1970-257; 1970 Tax Ct. Memo LEXIS 102; 29 T.C.M. (CCH) 1138; T.C.M. (RIA) 70257; September 3, 1970, Filed Janis Dimants, Jr., pro se, 2330 Innsbruck Pkwy., Columbia Heights, Minn., R. Burns Mossman, for the respondent. 1139 DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: Respondent determined a deficiency of $559.86 in petitioners' Federal income tax for the year 1967. The only issue for decision is whether a stipend in the amount of $4,690.31, received by petitioner Janis Dimants, Jr., during 1967 while a resident at Philadelphia General Hospital, constitutes a fellowship grant, $3,600 of which is excludable from his gross income, under section 117(a)(1)(B). [1]
Findings of Fact Some of the facts have been stipulated *103 by the parties and are found accordingly. Petitioners are husband and wife, who at the time of filing their petition in this proceeding maintained their legal residence at Columbia Heights, Minnesota. Petitioners timely filed their joint Federal income tax return for the year 1967 with the district director of internal revenue at Philadelphia, Pennsylvania. In their return petitioners reported the sum of $4,690.31 as received from the City of Philadelphia and excluded $3,600 as an "educational grant." Janis Dimants, Jr. (herein called petitioner) is a licensed physician. During the year 1967 he was a resident in obstetrics and gynecology at Philadelphia General Hospital (herein referred to as PGH). PGH is a public 2,000-bed institution owned and operated by the City of Philadelphia. The hospital renders services to the residents of Philadelphia and provides a complete and comprehensive medical care program. During the year 1967, the house staff numbered approximately 90 interns and 150 resident physicians and fellows. Most of the departments of the hospital were under the direction of full-time physicians. A visiting attending staff of over 500 physicians aided in rendering patient *104 care and conducted resident and intern training. During the year 1967, approximately 29,500 inpatients were treated and there were approximately 230,000 visits to the outpatient department. Over 750,000 laboratory examinations were performed, and over 170,000 X-rays were taken in the year 1967. Almost all patients at PGH were indigent, although occasionally a patient was able to provide part of the cost of the medical care received. The primary function of PGH was, and is, to provide patient care. It is also closely affiliated with Philadelphia's five medical schools: Temple University School of Medicine, The University of Pennsylvania School of Medicine, Hahnemann Medical College, Jefferson Medical College, The Woman's Medical College of Pennsylvania, and the Graduate School of Medicine at the University of Pennsylvania. To be eligible for a residency appointment at PGH, candidates had to meet the following requirements: (a) Graduation from an approved medical school in the United States or Canada: (b) Completion of one year of approved internship. (c) Eligibility for medical licensure (temporary or permanent) in the State of Pennsylvania. Upon selection, resident physicians *105 at PGH were appointed for one-year period, and continuation in the residency program was subject to reappointment upon the recommendation of the department to which the resident was assigned. Each resident was required to sign a contract for one year. Petitioner and PGH were under no continuing obligation or commitment to the other party upon expiration of a contract. PGH reserved the right to discharge a resident from further duties at any time for just cause, after review by the Board of Trustees. The duty program of a resident physician at PGH required that he be on call 24 hours a day, including weekends, with every third weekend off. Residents on call at night were required to remain in the hospital. Throughout petitioner's residency he was assigned duty in various wards. Petitioner was also subject to being assigned to duty in another part of the hospital should the need arise. The ward assignments to residents of the hospital were made by the heads of the respective departments. In his assigned ward, petitioner was charged with the care and initial responsibility of all patients in the ward. The ultimate responsibility for these patients was with the attending staff. A ward *106 typically contained 30 patients. Petitioner conducted rounds in his assigned ward twice daily. Included in the duties of petitioner were the recording of history and physicals on each patient in the 1140 assigned ward after admission of the patient, the maintaining of a progress report on each patient's record, the writing of transfer notes when a patient was transferred to another service, the posting of elective surgery, the obtaining of a patient's written consent for surgery, the placing of a patient's name on a danger list when the patient's prognosis was grave, the completing of death notices, the obtaining of permission for an autopsy, the notification of the medical examiner in the event of a body dead on arrival, the completing of the proper procedure when an accident occurred to a patient within the hospital, the reporting of all diseases required to be reported to the Department of Health, the preparation of discharge orders, and the preparation of a case summary after discharge of a patient. Petitioner was also required to accompany and supervise interns and first-year residents on rounds, conduct "bedside teaching," and to occasionally lecture to the nurses in obstetrics *107 and gynecology. The residents' responsibilities were specifically designated and increased progressively. The first-year residents worked with and were responsible to the second-year residents, who in turn were responsible to the senior consulting resident, who was responsible to the attending staff. Petitioner was initially responsible for decisions relating to admission, treatment, discharge, and proper utilization of consultants for the patients in the ward to which he was assigned. Two or three attending staff members were on call at all times. All of petitioner's cases were reviewed by the attending staff, and all residents at the hospital were answerable to the staff. All payments to resident physicians at PGH during the period of petitioner's residency were made through the City of Philadelphia payroll system from funds budgeted to the hospital. The City of Philadelphia did not provide for fellowships or scholarships in its budget in 1967. The cost accounting procedure at the hospital allocated the payments to residents and interns from an account entitled "Educational Fund." Other than the interns and residents at the hospital, no other persons received payments or benefits *108 from the "Educational Fund." Federal income taxes, social security taxes, Philadelphia wage taxes and pension contributions were withheld from payments made by the City of Philadelphia to petitioner. Petitioner began his residency program at PGH on October 1, 1965, and completed the residency on September 30, 1968. For the period October 1, 1965, to September 30, 1966, petitioner received a stipend in the amount of $3,090. For the period October 1, 1966, to September 30, 1967, petitioner received a stipend in the amount of $3,871. For the period October 1, 1967, to September 30, 1968, petitioner received a stipend in the amount of $5,100. The amount of the stipend paid to petitioner during his residency was not related to his financial needs and was determined solely with reference to the number of years of service as a resident physician. While serving as a resident physician at PGH, petitioner received a partial subsidy for room and board and was entitled to free medical care for himself and his family at the hospital. Petitioner was eligible to and did participate in a pension plan, to which he contributed throughout the year 1967. Petitioner was eligible to and did participate *109 in a group health insurance program entitled "Association Hospital Service of Philadelphia - Blue Cross and Blue Shield." PGH and petitioner contributed approximately 75 percent and 25 percent, respectively, toward the cost of the health insurance. The hospital did not allow petitioner, or any other person, discounts on meals eaten at the hospital. The hospital did not offer or provide group life insurance. The hospital did not provide malpractice insurance, nor were resident physicians required to obtain medical malpractice insurance, although it was strongly suggested they do so. During 1967, petitioner purchased medical malpractice insurance. The hospital did not provide uniforms for petitioner, but did provide laundry services. Petitioner received a paid two-week vacation annually and was entitled to limited sick leave. Petitioner was not required to attend any classes or to take instruction from the medical schools affiliated with PGH. Petitioner was not a degree candidate during his residency. However, upon completion of the program, petitioner received a certificate of residency. During the period of this residency PGH did prohibit petitioner from engaging in the private practice *110 of medicine. Throughout the year 1967 there were approximately 15 residents in obstetrics and gynecology at PGH. Had there not been resident physicians and interns at the hospital, the obstetrics and gynecology 1141 department would have required the additional time and services of attending staff physicians to provide medical care to patients. Similarly, the needs of the entire hospital as to patient care was a factor in determining the number of residents at the hospital. Ultimate Finding The stipend received by petitioner during 1967 constituted compensation for present employment services subject to the direction and control of PGH. Opinion Section 117(a) [2] excludes from gross income any amount received as a scholarship or fellowship grant. However, "before the exclusion comes into play there must be a determination that the payment sought to be excluded has the normal characteristics associated with the term 'fellowship.'" Elmer L. Reese, Jr., 45 T.C. 407, 413 (1966), affirmed per curiam 373 F. 2d 742 (C.A. 4, 1967); Irwin S. Anderson, 54 T.C. 1547 (1970). *111 Section 1.117-4(c), Income Tax Regs., [3] provides that payments representing "compensation for past, present, or future employment services" and payments made "to, or on behalf of, an individual to enable him to pursue studies or research primarily for the benefit of the grantor" are not to be considered scholarships or fellowship grants, excludable from gross income under section 117(a). The validity of these regulations has been upheld by the Supreme Court in Bingler v. Johnson, 394 U.S. 741 (1969), where it was stated at pages 757-758: The thrust of the provision dealing with compensation is that bargained-for payments, given only as a "quo" in return for the quid of services rendered - whether past, present, or future - should not be excludable from income as "scholarship funds." Hence, it is clear that these regulations have been designed, "at least in part, to distinguish relatively disinterested payments made primarily for the purpose of furthering the education of the recipient from payments made primarily to reward or induce the recipient's performance of services for the benefit of the payor." Jerry S. Turem, 54 T.C. - (1970); cf. Elmer L. Reese, Jr., supra at page 411. *112 It is petitioner's position, as expressed in his opening statement made at the commencement of the trial, that the primary purpose of his residency training program was to further his education and training under the continuous supervision of staff physicians at PGH, in preparation for examination and certification as a specialist by members of the *113 medical faculty of Hahnemann Jefferson Medical School and the University of Pennsylvania Medical School, each of which schools is affiliated with the teaching program at PGH. Petitioner also argues that his receipt of Educational Assistance Allowance from June 1, 1966, to September 22, 1968, through the Veterans Administration is additional proof that the primary purpose of his residency training program was educational in nature. Respondent contends that the entire stipend paid to petitioner during 1967 represented compensation for present services rendered PGH, which services were subject to the direction and control of PGH and were rendered primarily for the benefit of PGH. In the recent cases of Aloysius J. Proskey, 51 T.C. 918 (1969) and Irwin S. Anderson, supra, this Court considered factual situations almost identical to that presented in the instant case. In each of those cases the taxpayer was a resident at a university affiliated hospital and performed duties not unlike those performed by petitioner herein. In each case the taxpayer argued that his principal objective was to obtain training in his profession. As we stated in Proskey, supra at page 925: *114 1142 There can be no serious doubt that work as a resident physician provides highly valuable training, particularly in preparing for specialties in the various fields of medicine. Yet virtually all work as an apprentice, whether in medicine or law, carpentry or masonry, provides valuable training. Nothing in section 117 requires that an amount paid as compensation for services rendered be treated as a nontaxable fellowship grant, merely because the recipient is learning a trade, business or profession. Whatever training petitioner received during the years of his residency - and we do not deny that it was substantial - was merely "incidental to and for the purpose of facilitating the raison d' etre of the Hospital, namely, the care of its patients." Ethel M. Bonn, 34 T.C. 64, 73 (1960); * * * Likewise, as in Proskey, PGH was primarily engaged in the care and treatment of patients. As a 2,000 bed hospital, PGH handled approximately 29,500 inpatients and 230,000 outpatients during 1967. Its house staff was composed of 90 interns and 150 resident physicians and fellows in 1967, with a visiting attending staff of over 500 physicians aiding in rendering patient care *115 and resident and intern training. PGH obviously relied on its residents and interns to provide much of the required services for its patients. Not only were the needs of the hospital as to patient care a factor in determining the number of residents recruited, but petitioner's particular department, the obstetrics and gynecology department, would have required the additional time and services of attending staff physicians if there had been no residents or interns at PGH. As indicated in our findings of fact, petitioner herein had extensive duties in the wards, including the care and initial responsibility for all patients in his assigned ward. He was required to work many more than 40 hours per week because of the 24 hour a day call schedule to which each resident was subject. When on call at night, petitioner was even required to remain at the hospital. In view of petitioner's numerous required duties, which were subject to the direction and control of PGH, it is plainly evident that he was primarily engaged in providing patient care for the benefit of PGH. See Wertzberger v. United States, 314 F. Supp. 34 (D.C. Mo. 1970) 70-2 USTC 9549. Petitioner's financial arrangements *116 with PGH in 1967 also support the conclusion that he was rendering services to the hospital for which he was being compensated. The amount of petitioner's stipend was not dependent upon his financial need, as is usually customary with fellowship grants, but was based upon his length of service as a resident at PGH. See Edward A. Jamieson, 51 T.C. 635 (1969); Aloysius J. Proskey, supra. Moreover, the City of Philadelphia withheld Federal income taxes, Social Security taxes and Philadelphia wage taxes from payments made to petitioner during 1967. Such a procedure is not normally followed in the case of a "fellowship." Elmer L. Reese, Jr., supra.Petitioner also received hospitalization insurance, free medical care, a twoweek paid vacation, limited sick leave, was a participant in the pension plan maintained by PGH, and received a partial subsidy for room and board. These financial arrangements between petitioner and PGH, including the fringe benefits which he received, indicate to us that what in fact existed was an employee-employer relationship. Cf. Woddail v. Commissioner [63-2 USTC 9672], 321 F. 2d 721 (C.A. 10, 1963), affirming *117 a Memorandum Opinion of this Court, and Quast v. United States 428 F. 2d 750 (C.A. 8, 1970), affirming 293 F. Supp. 56 (D.C. Minn. 1968). Petitioner argues that the primary purpose of the residency program in which he was engaged was to further his education and training. He further argues that it was not a service-type program and was not intended as such. The training received, according to petitioner, was so intertwined with the care of patients that the two cannot of Appeals considered such an argument and in quoting from the opinion of the District Court which it affirmed, noted in pertinent part: Undoubtedly in many institutions of higher learning, certain vocational or other work which a student may do as an employee in commercial industry constitutes actual experience and credit is given therefor by the educational institution. Such does not necessarily make any payment received for such work a scholarship, however. 293 F. Supp. at 59-60. Here, the uncontested fact is that PGH was primarily engaged in providing patient care and whether petitioner sought to avail himself of the education and training provided in the residency program *118 offered at PGH is 1143 not the crucial factor. To the contrary, the key consideration is that PGH remunerated petitioner for services rendered. Cf. Ethel M. Bonn, 34 T.C. 64 (1960); Woddail v. Commissioner, supra; Quast v. United States, supra; Howard Littman, 42 T.C. 503 (1964); Stephen L. Zolnay, 49 T.C. 389 (1968) and Elmer L. Reese, Jr., supra.
Petitioner has cited two cases he deems favorable to his position and has included among the stipulated exhibits a one page article from a publication entitled "Hospital Physician." This article alludes to one of the cases cited by petitioner and is a sequel to an earlier article [4] which apparently is responsible for spurring numerous resident physicians and interns to contest the position of the Internal Revenue Service that their stipends do not qualify as fellowships properly excludable from gross income under section 117. The first case cited by petitioner, Wrobleski v. Bingler, 161 F. Supp. 901 (D. C. Penn., 1958) is clearly distinguishable from the instant case since PGH was not primarily an institution for teaching and research as was *119 Western State Psychiatric Institute and Clinic. In fact, the District Court in Wrobleski, supra, specifically discusses the difference between the Institute and ordinary hospitals where interns and residents are accepted for training in the performance of the type of services it is customarily the business of hospitals to furnish. Consequently, it was possible for the District Court in the Wrobleski case to conclude that the taxpayer, unlike petitioner herein, was primarily engaged in a course of study and research which only incidentally provided a minor benefit to the Institute by virtue of limited psychiatric care rendered by that taxpayer to certain patients. The second case cited by petitioner in support of his position is Pappas v. United States, 67-1 USTC 9386, 19 A.F.T.R. 2d 1276 (D. Ark., 1967), where a jury, based upon the evidence presented, determined that payments made to Dr. Pappas as a resident physician by the University of Arkansas Medical Center were made primarily for the purpose of furthering his education and training in his individual capacity and did not represent *120 compensation or payment for his services. We are unable to make such a factual finding with respect to petitioner in the instant case. Accordingly, we hold on this record that the stipend received by petitioner during 1967 is beyond the exclusionary provisions of section 117. Decision will be entered for the respondent. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.↩
2. SEC. 117. SCHOLARSHIPS AND FELLOWSHIP GRANTS. (a) General Rule. - In the case of an individual, gross income does not include - (1) any amount received - (A) as a scholarship at an educational institution (as defined in section 151(e)(4)), or (B) as a fellowship grant, including the value of contributed services and accommodations * * *↩
3. Sec. 1.117-4 Items not considered as scholarships or fellowship grants. The following payments or allowances shall not be considered to be amounts received as a scholarship or a fellowship grant for the purpose of section 117: * * * (c) Amounts paid as compensation for services or primarily for the benefit of the grantor. (1) Except as provided in paragraph (a) of § 1.117-2, any amount paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research, if such amount represents either compensation for past, present, or future employment services or represents payment for services which are subject to the direction or supervision of the grantor. (2) Any amount paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research primarily for the benefit of the grantor.↩
4. "Is Your Entire Stipend Taxable?" Hospital Physician, October 1967.↩