HARVEY P. UTECH, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4991–68. Filed December 9, 1970.

Harvey P. Utech, pro se.
*John J. Weiler,* for the respondent.

STERRETT, *Judge:* The respondent determined a deficiency in the Federal income taxes of the petitioner for the taxable year 1966 in the amount of $740.83.

Since petitioner has made concessions, there is one issue remaining before this Court. We are to determine whether a portion of the amounts received by petitioner from the National Bureau of Standards in 1966 was properly excludable from income as a fellowship pursuant to section 117 of the Internal Revenue Code of 1954.[1]

FINDINGS OF FACT

Some of the facts are stipulated. The stipulation and exhibits attached thereto are incorporated herein by this reference.

---

[1] All statutory references are to the Internal Revenue Code of 1954 unless otherwise specified.

Harvey P. Utech (hereinafter referred to as petitioner) is an unmarried individual who resided in Washington, D.C., at the time of filing his petition herein. Petitioner filed an individual Federal income tax return for the calendar year 1966 with the district director of internal revenue, Baltimore, Md.

During 1966 the petitioner was a National Academy of Sciences— National Research Council Postdoctoral Research Associate at the National Bureau of Standards, Washington, D.C. During that time petitioner was not a candidate for any degree. It has been stipulated by the parties that petitioner received $10,250 per annum as a stipend from the National Bureau of Standards while in the status of a postdoctoral research associate.[2]

The National Bureau of Standards (sometimes hereinafter referred to as NBS or the Bureau) is a Government-operated laboratory engaging in basic and applied research in the areas of physical standards and constants, the properties of matter, and measurements. The Bureau, in conjunction with the National Academy of Sciences— National Research Council (sometimes hereinafter referred to as NAS–NRC), established in 1954 a program variously referred to as a postdoctoral resident research associateship or postdoctoral research associateship.

The program is designed to bring to NBS a yearly influx of bright, young Ph. D.'s who would make a contribution and then go on to other activities outside the Bureau. The benefits attributable to such a program are deemed twofold. The Bureau is benefited because the associate brings new ideas and research proposals, and new notions for proceeding on present research, in addition to interacting with, and thereby upgrading, the whole staff of NBS. The associate, in turn, is provided with an opportunity to pursue advanced training in basic research in the physical and mathematical sciences in association with a senior member of the NBS staff.

Postdoctoral research associates normally commence in July and continue for a year with the possibility of reappointment for a second year. Each year the Bureau publishes a brochure listing both the areas of investigation which are available for postdoctoral research and the scientific advisers on the staff who will supervise research in those areas.

Pursuant to an agreement between it and NBS, NAS–NRC selects and certifies qualified postdoctoral research associates to NBS. This arrangement was formulated so that the program would have the

[2] In his brief petitioner requested the Court find as a fact that he received $11,163.20 from the Bureau of Standards. Although this is the amount which appears on petitioner's return as income from "Wages, salaries, tips, etc.," and respondent did not object to petitioner's request for finding, the discrepancy between the requested amount and the stipulated amount has not been explained by the parties.

prestige, and thus the attractiveness, of the NAS–NRC fellowship program. NAS–NRC participates because it feels that substantial post-doctoral research and training opportunities are available at NBS, and because the program presents young scientists and engineers with good opportunities for initial professional employment.

Application for a postdoctoral research associate must be made to the NAS–NRC by February 1. Included in the application must be a plan indicating the research the prospective associate would pursue. Prior to making application the prospective research associate must contact the scientific adviser at the NBS under whom the candidate wants to work, and obtain from that person an acknowledgement that the research planned by the applicant is within the area of interest acceptable to the scientific adviser. Evidence of this acknowledgement must be submitted with the application to NAS–NRC. Clearance of a proposed project prior to application is required so that it will be consistent with research projects being currently carried on by NBS. This consistency is necessary because the Bureau has no authority to grant an individual money with which to pursue his own educational goals and cannot apply its funds in a manner which does not further the mission of the Bureau and assist it in realizing current project responsibilities. When a plan submitted by a prospective associate is not within the confines of matters presently being considered within NBS and thus of value to the Bureau, the plan is rejected or the candidate is given the opportunity to revise it.

The NAS–NRC assembles a panel of scientists and/or engineers who examine all prospective associates and prepare rank-ordered lists of applicants. These panels never include NBS staff members or consultants. Upon approval by the NAS–NRC, an associate receives notification of his appointment by mail from the director of NBS.

A postdoctoral research associate receives his appointment as a schedule A temporary Federal Government employee.[3] Thus an associate is exempt from the competitive hiring requirements of the Civil Service Act.[4]

---

[3] The relevant schedule A authority for the year before the Court, 1966, can be found in 5 C.F.R. sec. 213.3114 (1964), which provides:

Sec. 213.3114 Department of Commerce.

(e) *National Bureau of Standards.* (1) Scientific and professional research associate positions when filled on a temporary or intermittent basis by persons having a doctoral degree in physical science or related fields of study, for research activities of mutual interest to the appointee and the Bureau. Total employment under this provision may not exceed 20 new appointments each fiscal year, including those at the headquarters and at the Boulder, Colorado, Laboratories of the Bureau. Employment under this provision shall not exceed 1 year in any individual case: *Provided,* That such employment may, with the approval of the Commission, be extended for not to exceed an additional year. Such extensions shall not be included against the quota of 20 new appointments as stated above.

[4] 5 U.S.C. sec. 3301 *et seq.;* Exec. Order 10577, 3 C.F.R. 218 (1954–1958 Comp.); 5 U.S.C. sec. 631 (1964).

The NBS end of this selection process is handled by a subcommittee of the educational committee in the Bureau rather than the personnel division to keep the program separate from any recruiting of regular employees. This arrangement was required by NAS–NRC. Although the personnel division does not participate in the selection activity, it does process the appointment papers for all postdoctoral research associates. In terms of personnel management there is no difference in the treatment of research associates and regular employees once they have been selected to work at the Bureau; the processing and initiation of paper work is the same in both cases.

A Ph. D. who is applying for a position as a regular permanent employee with the Bureau files a standard Government employment application form with either the personnel office or with one of the line supervisors in NBS. If he is selected for employment, his papers are handled by the personnel division which determines whether the individual has met all the civil service requirements and has been certified by the Civil Service Commission.

A research associate receives the same amount of money each year as does a permanent Bureau employee of the same caliber and qualifications, i.e., a new, high-quality Ph. D. The amount was set at this level so that the Bureau would attract the best talent it possibly could and because the associates, being schedule A appointees, had no tenure rights. Lacking tenure rights, an associate does not receive health benefits and retirement benefits. He does, however, receive the same amount of sick and annual leave as a regular employee. If, at the termination of his period of appointment, a research associate continues with the Bureau, but as a permanent employee, he is given credit for his prior temporary service.

In the first instance, research associates are given much more freedom than regular employees in the selection of projects and supervisors. The day-to-day supervision of a research associate varies with the individual but is similar to that exercised over regular employees of like ability. An associate works the same hours and keeps a time card as do regular employees of the Bureau.

Projects carried on at the Bureau by research associates are held in higher regard than ordinary projects. It is thought important that an associate be permitted to accomplish what had been mutually agreed could be accomplished during the period of his appointment. Thus an associate would not be taken off his project, as would a regular employee, to do other work.

The research associate program was financed in its formative years by the various section and division chiefs out of their operating funds.

Subsequently the program was financed from a central fund in the NBS Director's office. The funding was centralized to permit freedom in locating associates within the organization. The fund is part of the amount appropriated to the Bureau by Congress.

Petitioner began his association with NBS in April 1965. He was in the status of postdoctoral research associate throughout the taxable year 1966. The research project pursued by petitioner concerned the effects of thermal convection on crystal growth. The project was approved by petitioner's scientific adviser, Dr. Lawrence Kushner of the Metallurgy Division. Petitioner's project was an outgrowth of his doctoral thesis at the Massachusetts Institute of Technology. That particular project would not have been done at NBS without the petitioner. In his selection, appointment, and tenure, petitioner was treated the same as any other postdoctoral research associate at NBS.

In his 1966 Federal income tax return petitioner excluded from gross income $3,600 as a "NAS/NRC Postdoctoral Fellowship." Respondent disallowed the exclusion and in a statutory notice dated July 29, 1968, said:

It is determined that the amount of $3,600.00 claimed as an exclusion from gross income on your income tax return for 1966, purportedly representing an amount received from a scholarship or fellowship grant, is not excludable under section 117 of the Internal Revenue Code. The amount of $3,600.00 represents compensation received by you for your employment services and is taxable to you under section 61 of the Internal Revenue Code.

### OPINION

The question to be decided by this Court is whether the $3,600 excluded from gross income by petitioner comes within the purview of section 117 which permits the exclusion of certain amounts received as fellowship grants,[5] or whether that amount is includable in

---

[5] SEC. 117. SCHOLARSHIPS AND FELLOWSHIP GRANTS.

    (a) GENERAL RULE.—In the case of an individual, gross income does not include—

        (1) any amount received—

        \*      \*      \*      \*      \*      \*      \*

        (B) as a fellowship grant,

        \*      \*      \*      \*      \*      \*      \*

    (b) LIMITATIONS.—

        \*      \*      \*      \*      \*      \*      \*

        (2) INDIVIDUALS WHO ARE NOT CANDIDATES FOR DEGREES.—

        \*      \*      \*      \*      \*      \*      \*

        (B) EXTENT OF EXCLUSION.—The amount of the scholarship or fellowship grant excluded under subsection (a)(1) in any taxable year shall be limited to an amount equal to $300 times the number of months for which the recipient received amounts under the scholarship or fellowship grant during such taxable year, \* \* \*

income as compensation under section 61(a)(1).[6] Petitioner appeared pro se and represented himself with a level of skill and competence which this Court found impressive. His briefs, too, were of a high caliber. Unfortunately, the law does not favor the petitioner's cause and we must find against him.

Reviewing briefly the salient facts, petitioner participated during the year at issue in the postdoctoral research associate program at the National Bureau of Standards. He received his appointment as a 1-year temporary employee under schedule A of the Civil Service regulations. Accordingly petitioner was excepted from the competitive civil service and did not receive health and retirement benefits. The compensation and supervision received by petitioner was the same as received by any regular Bureau employee with similar qualifications and ability.

Petitioner did research in the Metallurgy Division of NBS on the effects of thermal convection on crystal growth. Prior to petitioner's appointment, his project was approved by his scientific adviser who was chief of the Metallurgy Division. Such prior approval was required of all projects to be undertaken by postdoctoral research associates. Since the Bureau could not use its congressionally appropriated funds to finance the personal educational objectives of an individual, but rather must use all such funds to further NBS operational objectives, postdoctoral projects had to be matched with the current operational concerns of the Bureau.

The Bureau established the program to create a flow-through of bright, new Ph. D.'s who would bring new ideas and research proposals, and new notions for proceeding on present research, and who would interact with and thereby upgrade the permanent staff. Petitioner and other postdoctoral associates were attracted to the program because it provided them with an opportunity to pursue advanced training in basic scientific research in conjunction with a senior scientist on the Bureau staff.

To secure the exclusion he seeks under section 117(a) petitioner must show that the payments he received have the normal characteristics of a fellowship grant. *Elmer L. Reese, Jr.*, 45 T.C. 407, 413 (1966), affirmed per curiam 373 F. 2d 742 (C.A. 4, 1967). In *Bingler* v. *Johnson*, 394 U.S. 741 (1969), the Supreme Court approved respondent's regulations which exclude from the definition of fellowship grants amounts paid as "compensation * * * for services * * * subject to the direction or supervision of the grantor" and amounts

---

[6] SEC. 61. GROSS INCOME DEFINED.

(a) GENERAL DEFINITION.—Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items:

(1) Compensation for services, including fees, commissions, and similar items;

paid an individual "to enable him to pursue studies or research primarily for the benefit of the grantor." Sec. 1.117–4(c), Income Tax Regs. Specifically, the Supreme Court said:

The thrust of the provision dealing with compensation is that bargained-for payments given only as a *"quo"* in return for the *quid* of services rendered— whether past, present, or future—should not be excludable from income as "scholarship" funds.[32] [*Bingler* v. *Johnson, supra* at 757–758. Footnote omitted.]

The National Bureau of Standards received a clear material benefit in return for the amounts it tendered to petitioner in 1966. Certainly the Bureau received a substantial "quid" for its "quo." Consequently the stipend received by the petitioner from the Bureau cannot be considered a fellowship grant within the meaning of section 117(a).

There was much evidence that the program presents a good opportunity for postdoctoral research and study, and we are convinced that it did for petitioner. This, however, is not determinative. *Aloysius J. Prosky*, 51 T.C. 918, 925 (1969). There was testimony that petitioner's project would not have been done at the Bureau had he not been there. Nonetheless, the project was approved because it was consistent with areas of interest to the Bureau. See *John E. MacDonald, Jr.*, 52 T.C. 386, 392 (1969). NBS could not use its appropriated funds for any purpose that did not contribute to the accomplishment of objectives for which it was established. Thus it appears that petitioner contributed professional services which aided the Bureau in achieving its objectives and for which he received compensation. *Howard Littman*, 42 T.C. 503, 509 (1964); *Ethel M. Bonn*, 34 T.C. 64, 72 (1960).

For his participation in the program petitioner received an aggregate amount of $10,250. This amount of remuneration was equal to that given regular employees of equivalent ability. *Elmer L. Reese, Jr., supra* at 411. The level of remuneration was established to attract persons to the position of postdoctoral research associate, and was not keyed to the financial need of the recipient. *John E. MacDonald, Jr., supra* at 393; *Edward A. Jamieson*, 51 T.C. 635, 639 (1969).

Petitioner received the same sick and annual leave benefits as regular employees. This is an additional indication that petitioner was performing services for compensation. *Irwin S. Anderson*, 54 T.C. 1547, 1552, (1970). To be sure, petitioner was a temporary employee and as such did not receive retirement and health benefits. However, the absence of some of the benefits normally afforded regular employees does not, ipso facto, convert petitioner's research job into a fellowship. See *Howard Littman, supra* at 506. We further note that petitioner was subject to the same supervision and hours and conditions of employment as regular employees of like qualification. *Stephen L. Zolnay*, 49 T.C. 389, 397, 398 (1968).

We attach no particular significance to the fact that petitioner was

·selected for his associateship by the National Academy of Sciences—National Research Council, and that the administrative processing of his appointment and certain other personnel management features were different from those applied to regular Bureau employees. The evidence indicates that NBS sought NAS–NRC participation to increase the prestige and attractiveness of the program and thus more nearly achieve its objective of securing the services of highly qualified persons. In any event it remains that, however petitioner acquired his position and whatever his objectives, he was performing services of material value to the grantor of his stipend. *Bingler* v. *Johnson, supra.*

In accordance with the foregoing, and because of concessions by petitioner,

*Decision will be entered for the respondent.*