Charles F. Wall v. Commissioner.
Wall v. Commissioner
Docket No. 3304-71.
United States Tax Court
T.C. Memo 1972-217; 1972 Tax Ct. Memo LEXIS 39; 31 T.C.M. (CCH) 1069; T.C.M. (RIA) 72217; October 19, 1972
*39 The petitioner had experience as a computer programmer. While a student enrolled in the College of Business Administration at the University of Hawaii, he received a stipend because of his work on the Dimensionality of Nations Project of the political science department. The stipend was granted to him to secure the services of a computer programmer and thereby to fill a critical need of the project. Held, no part of the stipend is excludable as a scholarship or fellowship under sec. 117, I.R.C. 1954. Charles F. Wall, pro se, 45-342 Lilipona Road, Kaneohe, Hawaii. Nancy L. Simpson, for the respondent. SIMPSON
Memorandum Findings of Fact and Opinion SIMPSON, Judge: The respondent determined a deficiency of *40 $414.00 in the petitioner's Federal income tax for the year ending December 31, 1968. The single issue for decision is whether a stipend received by the petitioner was a scholarship or fellowship excludable under section 117, Internal Revenue Code of 1954. [1]
Findings of Fact Some of the facts were stipulated, and those facts are so found. The petitioner, Charles F. Wall, resided in Kaneohe, Hawaii, at the time his petition was filed in this case. His individual Federal income tax return for the year 1968 was filed with the Western Service Center at Ogden, Utah. Although married now, the petitioner was an unmarried individual at that time. In 1966, the petitioner entered the College of Arts and Sciences of the University of Hawaii (the university) as an undergraduate. In February 1968, he transferred to the College of Business Administration and remained there as a student until he transferred back to the College of Arts and Sciences in December 1968. In May 1970, he was graduated from the university with a Bachelor of Arts degree obtained in the liberal arts program. The university *41 is an educational institution as defined in section 151(e)(4). On September 18, 1967, the petitioner became associated with the Dimensionality of Nations Project (the project) at the university. The project was in the political science department and was engaged in basic research and was concerned with delineating the major dimensions of interaction between nations. The major purpose of the project was to employ mathematics in the study of international relations to determine the causation of international conflict. Dr. R. J. Rummel, a professor at the university, was in charge of the project, and as such, such, was known as the principal investigator. He had been associated with the project, at other universities, since 1962. The earlier stages of the project had been supported by the National Science Foundation. However, on April 15, 1967, Dr. Rummel submitted a proposal, through the university, to the Office of Behavioral Sciences, Advanced Research Projects Agency, Department of Defense (ARPA), in order to secure additional support for the project. The proposal, under the heading "Salaried Personnel," contained a request for a computer programmer in the following terms: *42 One programmer is a full-time necessity. Not only must new programs constantly be written for the Project, but old programs must continually be revised as computer systems change and as our methodological needs alter. The programmer, moreover, will be a central figure in building the computer model under Task 3. Under the heading of "Additional Personnel," a request was made for research assistants in the following terms: Research assistants are a basic part of the research. As part of a DON [Dimensionality of Nations] program within the Political Science Department, all assistants will be graduate students working towards their higher degrees. Their inclusion in the proposal has two purposes, therefore. First, they are intended to assist in the research proposed. Secondly, 1070 and just as important for the future of such research, they are included as trainees. While carrying out various research tasks they will be learning research procedures and methods that will be invaluable in their own future work. On September 1, 1967, an Award/Contract was issued by the Office of Naval Research in response to the proposal. Under the contract, the project was required, among other *43 things, to prepare and submit quarterly technical research reports for publication. Prior to his association with the project, the petitioner was in charge of the computer center of the Social Science Research Institute of the university. Dr. Rummel, who was also interested in developing students able to do creative research in the area of quantitative international relations, became aware of the petitioner's background in computer programming and possible interest in the social sciences. He approached the petitioner with an invitation to join the project and offered a stipend to induce him to accept. Although the petitioner was selected to participate in the project because of his experience in computer programming, the other research assistants who were receiving stipends to work on the project were selected because of their outstanding academic records. In 1968, the petitioner worked on the project for at least 11 months. During such period, it was customary for him to work between 40 and 60 hours each week. Although there were no formal requirements as to the time worked on the project by a recipient of a stipend, he was expected to put in a substantial amount of time so that *44 the methodologies involved in the research could be mastered. The petitioner spent a majority of the time that he worked on the project in 1968 researching the problem of missing data. Specifically, the petitioner did research in the area of matrices having missing data and the use of computer techniques in estimating the content of the data missing. He was interested in this topic, and after being advised by Dr. Rummel that research in the area would be of value to the project, the petitioner chose to allocate a substantial part of his time to it. During the course of the petitioner's research, Dr. Rummel gave mathematical and technical suggestions, including some concerning the reformulation of questions being asked and hypotheses being investigated. In January 1969, the petitioner and Dr. Rummel submitted a report to ARPA based on the research conducted by the petitioner. Aside from conducting research in the area of missing data, the petitioner devoted at least 30 percent of his time each week to other duties described as task oriented. As such, he assumed more and more responsibility as a computer programmer. During 1968, his duties were so essential that, had he not performed *45 them, the project would have required the services of another computer programmer as a replacement. Dr. Rummel, recognizing the crucial role being played by the petitioner's programming in the development of the research of the project, recommended that a merit increase be added to his stipend. In a memorandum dated February 7, 1969, Dr. Rummel justified the proposed increase, in part, for the following reasons: Charles Wall's pay has long been depressed below what it should be by virtue of his being an undergraduate at the University of Hawaii. Full time computer programmers of ability comparable to Mr. Wall's and doing comparable work would be receiving two to three times the amount that Mr. Wall is now getting. Therefore, I think it is imperative that he be given a merit increase to indicate to him our recognition of his contribution to the Project and to bring him more in line, however slightly, with the salary he should be getting for the work he is doing. Although Dr. Rummel controlled the manner in which the ARPA grant was used, the university was the actual recipient of the funds. It monitored the expenditures of the project to ensure that no regulation was violated in *46 the course of the performance of the project. As a general rule, it ensured that all expenditures connected with a reasearch grant, such as the stipend given to the petitioner, were made to further the completion of the contract. The university also made the actual payment to the petitioner. The stipend was paid according to the provisions of Standard Form 5B of the State of Hawaii. Form 5B, commonly known as the notification of personnel action, is the equivalent of a contract. It was maintained in the files of the Personnel Office of the university and was used to appoint all Board of Regents employees. On September 18, 1967, the 1071 petitioner was appointed to the position of Assistant in Political Science, at a rate of $541 per month, although he was to receive only half that amount since he was to work only half time. Effective July 1, 1968, his stipend was increased to the rate of $563 per month. In paying the petitioner in 1968, the university withheld $526.92 from his stipend and reported this amount on a W-2 Form. Other stipend recipients associated with the project were paid according to the same form and had portions withheld in the same manner. During 1968, the *47 petitioner was not enrolled in any course conducted by Dr. Rummel and received no formal credit for the research performed by him on the project. He was neither a student at the College of Arts and Sciences, nor a declared major in the field of political science. During the second session of summer school in 1968, the petitioner enrolled in a course in educational psychology entitled "Computer Applications in the Behavioral Sciences." The major requirement for the course was a research paper, and the petitioner's paper was based on his research relating to missing data performed in connection with the project. Such research was begun by the petitioner prior to his enrollment in the course. The petitioner completed the course and received a grade of "A." During the academic years beginning in 1966 and ending in 1969, the university had no formal requirement that research was a prerequisite for a Bachelor of Arts degree. In 1968, the petitioner received $3,312.00 from the university, from which $526.92 was withheld. However, such amount has been refunded to him. In connection with the claim for refund, a certificate of exclusion was furnished to the district director. This document, *48 signed by Dr. Rummel, stated that the primary purpose of the stipend was the furtherance of the petitioner's education. It also stated that the university gave credit for the research performed, that equivalent research was required for all candidates for the degree sought by the petitioner, and that the amount did not vary in accordance with the research performed. In his notice of deficiency, the respondent determined that the amount paid by the university did not constitute a scholarship or fellowship excludable from gross income within the meaning of section 117. Opinion The only issue to be decided is whether the stipend received by the petitioner from the university in 1968 was a scholarship or fellowship excludable from income under section 117. Section 117 provides that an amount received as a scholarship or fellowship is excludable from gross income, but the statute does not define the term scholarship or fellowship. Not all grants received by students are necessarily scholarships or fellowships. Bingler v. Johnson, 394 U.S. 741, 753 (1969). For a stipend to be excluded from income under section 117, it must have the normal characteristics associated *49 with the term scholarship or fellowship. Elmer L. Reese, Jr., 45 T.C. 407, 413 (1966), affd. per curiam 373 F. 2d 742 (C.A. 4, 1967). A definition of an excludable scholarship or fellowship is set forth in section 1.117-4(c) of the Income Tax Regulations, approved as reasonable in Bingler v. Johnson, supra.
Such section of the regulations provides that where the primary purpose of the studies or research is to further the education and training of the recipient in his individual capacity and the amount provided by the grantor does not represent compensation or payment for past, present, or future services, an amount paid or allowed the taxpayer will qualify as a fellowship. However, the term scholarship or fellowship does not include any amount paid to an individual to compensate him for past, present, or future services, even though such amount is paid to enable him to pursue studies or research. In short, payments qualifying as fellowships must be "relatively disinterested, 'no-strings' educational grants, with no requirement of any substantial quid pro quo from the recipients." Bingler v. Johnson, supra at 751. Such payments *50 are made primarily for the purpose of furthering the education of the recipient, and not primarily to reward or induce the recipient's performance of services for the benefit of the payor. Frederick Fisher, 56 T.C. 1201, 1211 (1971); Jerry S. Turem, 54 T.C. 1494, 1505 (1970). Whether a payment qualifies as a fellowship for purposes of section 117 depends upon the relevant facts and circumstances. Stephen L. Zolnay, 49 T.C. 389, 395 (1968); Chander P. Bhalla, 1072 35 T.C. 13, 17 (1960). On the basis of the facts in the record, we hold that the payments made to the petitioner by the university were "given only as a 'quo' in return for the quid of services rendered" by the petitioner. Bingler v. Johnson, supra at 757. The major purpose of the project was to employ mathematics in the study of international relations. The proposal submitted by Dr. Rummel to ARPA requested certain funds for the procurement of a computer programmer. A central figure in the performance of the research contract was the computer programmer. The primary purpose of the stipend was to attract a person, such as the petitioner, with a background *51 in computers. The petitioner was selected because of his experience with computers, and, unlike the other participants in the project, not because of his academic performance. If he had not been working on the project, it would have been necessary to secure the services of another computer programmer. The services performed by the petitioner were rendered in connection with research, which thereby facilitated the raison d'etre of the project. As such, aside from the subject matter, there is little difference between the facts before us today and those found in the line of cases dealing with payments made to resident physicians. See Frederick Fisher, supra at 56 T.C. 1211, 1212, and the cases listed therein. As in those cases, the stipend was offered to induce services required by the grantor. Frederick Fisher, supra at 1213. The record indicates that the petitioner performed extensive and valuable services for the project. It was customary for him to work on the project for at least 40 hours each week during 1968. His computer programming was crucial to the development of the project. Much of his time was spent performing the tasks of programming *52 the work on the project. His research concerning missing data did involve some independent work, but that research was also performed with the advice and approval of Dr. Rummel. Such research also did relate to the objectives of the project and resulted in a report which was published by the project. In both instances, his activities were directed to the fulfillment of a contractual commitment of the project. In Stephen L. Zolnay, supra, services in fulfillment of a contractual commitment, performed during a 40-hour work week, under the general supervision of the grantor, were among a number of factors considered by the Court in finding the exclusion of section 117 to be inapplicable. The presence of these factors in this case leads us to the same conclusion. Furthermore, both the university and Dr. Rummel treated the petitioner as an employee. The petitioner was offered a stipend in order to provide services as a computer programmer. He was appointed by the same form used to appoint Board of Regents employees, and like other employees, had Federal income tax withheld from each check. Lastly, the request made by Dr. Rummel for an increase in the petitioner's stipend *53 was based entirely on the services performed by the petitioner and his value to the project. See Stephen L. Zolnay, supra at 49 T.C. 398; Howard Littman, 42 T.C. 503, 510 (1964). Although the petitioner received training in the methods, the mathematics, and the computer usage involved in the field of quantitative international relations, the mere fact that the services he performed were related to academic endeavors does not mean he was paid to study rather than to work. See Stephen L. Zolnay, supra at 49 T.C. 396. In the matrix of facts before us, we feel that whatever training the petitioner received was "incidental to and for the purpose of facilitating the raison d'etre" of the project, namely, research. Ethel M. Bonn, 34 T.C. 64, 73 (1960); see Woddail v. Commissioner, 321 F. 2d 721 (C.A. 10, 1963), affg. a Memorandum Opinion of this Court, Frederick Fisher, supra at 56 T.C. 1215; Aloysius J. Proskey, 51 T.C. 918, 925 (1969). In Quast v. United States, 293 F. Supp. 56, 59 (D. Minn. 1968), affd. 428 F. 2d 750 (C.A. 8, *54 1970), the court stated that the character of a payment "is determined fundamentally by the usual test of the parties [sic] intent." The petitioner reads such statement literally and reasons that because both he and Dr. Rummel intended the payment to be a fellowship, the provisions of section 117 automatically apply. We disagree. The intent of the parties is not demonstrated by self-serving statements relating to subjective impressions; rather, it must be proved by objective facts and 1073 circumstances which surround the payment and shed light on its primary purpose. Stephen L. Zolnay, supra at 49 T.C. 395; Chander P. Bhalla, supra at 35 T.C. 17. The objective factors involved in this case have been discussed and justify our conclusion. Under section 117(b)(1), if research is required of all candidates for a degree, whether or not they receive scholarships or fellowships, the compensation for such research may be excludable. The petitioner is apparently aware of that provision and also seems to believe that the stipend received by him may be exempt under such provision. However, at that time, the university had no formal requirement for *55 the performance of research by the candidates for the degree sought by the petitioner. In 1968, he was not enrolled in the political science department, and he never received any credit in that department for the research performed by him on the project. Nor did the College of Business Administration, where he was enrolled at that time, give him any credit for such research. Although he was able to use the results of his research on missing data to fulfill the requirement of his course in educational psychology, it was merely fortuitous that such research could be used to prepare his paper in that course, and he was not even enrolled in the course at the time he commenced the research. Thus, his research on the project does not come within the exemption of section 117(b)(1). The petitioner also argues that he is entitled to exclude his stipend because other recipients of stipends working on the project were allowed to exclude theirs. However, it appears that there may be significant differences between the petitioner's situation and those of the other recipients of stipends. The record indicates that the research assistants were graduate students in political science, whereas the *56 petitioner was an undergraduate in the College of Business Administration. Other stipends were given because of top academic credentials, whereas the petitioner's was given because of his computer background. In the proposal for the research project, the justification for a computer programmer differed from that for research assistants. Moreover, even if the circumstances surrounding the payments made to others were identical to those of the petitioner, evidence relating to the administrative disposition of another case by the respondent is of little probative value. Cf. Fitts' Estate v. Commissioner, 237 F. 2d 729, 734 (C.A. 8, 1956), affg. a Memorandum Opinion of this Court (involving valuation). Nor do we agree with the petitioner's suggestion that a constitutional right was violated by the respondent's enforcement of the law in this case. There is no "equal protection" to be availed of in the Fifth Amendment. La Belle Iron Works v. United States, 256 U.S. 377, 392 (1921). Nor can we say that he has been denied due process of law even if another taxpayer has been offered a windfall as a result of the respondent's litigation strategy. Lincoln Savings & Loan Association, 51 T.C. 82, 107 (1968), *57 revd. on other grounds 422 F. 2d 90 (C.A. 9, 1970), revd. on other grounds 403 U.S. 345 (1971). In short, the petitioner must stand or fall on the merits of his own case. A showing that other taxpayers followed an improper practice does not give the petitioner a right to follow such a practice. Cf. Weller v. Commissioner, 270 F. 2d 294, 298, 299 (C.A. 3, 1959), affg. 31 T.C. 33 (1958), cert. denied 364 U.S. 908 (1960); Bornstein v. United States, 345 F. 2d 558, 564 (Ct. Cl. 1965); Adolph B. Canelo III, 53 T.C. 217, 225 (1969), affd. per curiam 447 F. 2d 484 (C.A. 9, 1971) (all of which involved private rulings given to other taxpayers). But cf. International Business Machines Corp., 343 F. 2d 914 (Ct. Cl. 1965). Decision will be entered for the respondent. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954.↩